IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MATSON NAVIGATION COMPANY, INC., <br><br> 1411 Sand Island Parkway <br> Honolulu, HI, <br><br>     Plaintiff, <br><br>  v. <br><br> DEPARTMENT OF TRANSPORTATION <br><br> 1200 New Jersey Avenue, S.E. <br> Washington, D.C. 20590, and <br><br> MARITIME ADMINISTRATION, <br><br> 1200 New Jersey Avenue, S.E. <br> Washington, D.C. 20590, <br><br>     Defendants. | Civil Action No. 22-cv-1975 |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiff Matson Navigation Company, Inc. ("Matson" or "Plaintiff"), for its complaint against the Department of Transportation and the Maritime Administration ("MARAD") (collectively "Defendants"), by and through its attorneys, alleges as follows:

**INTRODUCTION**

1.   This action arises from MARAD's approval of a vessel for inclusion in the Maritime Security Program (the "MSP"), which MARAD, an agency within the Department of Transportation, administers pursuant to the Maritime Security Act of 2003 (the "MSA"), as amended.

2.   The MSP provides financial assistance to the operators of certain U.S.-flag vessels operating in foreign commerce, in part to compensate for the higher costs of building, maintaining, and operating U.S.-flag vessels, as well as to advance national security by ensuring that the United

States maintains a viable U.S.-flag presence in international commercial shipping.  *See* 46 U.S.C. § 53102(a); 139 Cong. Rec. H8832 (Nov. 4, 1993) (discussing a predecessor program to the MSP).

3.      Not all vessels operating in international shipping are eligible for MSP subsidies. Rather, Congress required that any participating vessel must meet a number of statutory eligibility requirements.

4.      The vessel must be "suitable for use by the United States for national defense or military purposes in time of war or national emergency, as determined by the Secretary of Defense," and must be "commercially viable, as determined by the Secretary."  46 U.S.C. § 53102(b)(4).

5.      The vessel must be "a United States-documented vessel" or if not a United States-documented vessel, the owner of the vessel must have "demonstrated an intent to have the vessel documented under [46 U.S.C. chapter 121] if it is included in the [MSP] Fleet," and "at the time an operating agreement for the vessel is entered into under this chapter, the vessel [must be] eligible for documentation under [46 U.S.C. chapter 121]."  46 U.S.C. § 53102(b)(5).

6.      Most relevant here, to protect U.S.-flag vessels operating in domestic trade from unfair competition from subsidized vessels, MSP vessels "shall be operated exclusively in the foreign commerce or . . . in mixed foreign commerce and domestic trade allowed under a registry endorsement," and "shall not otherwise be operated in the coastwise trade."  46 U.S.C. § 53105(a)(1); *see also* 46 C.F.R. §§ 296.2, 296.11.

7.      Moreover, other than a replacement vessel under 46 U.S.C. § 53105(f), any vessel "first covered by an operating agreement after the date of the enactment of the National Defense Authorization for Fiscal Year 2018" shall "not be operated in the transportation of cargo between

points in the United States and its territories either directly or via a foreign port."  46 U.S.C. § 53105(a)(2).

8.      MSP subsidies are awarded to contractors pursuant to written agreements, which identify the vessel that will be operated as part of the MSP Fleet.  A vessel under an active existing agreement may be replaced with a different subsidized vessel only with the approval of the Secretary of Transportation and the Secretary of Defense or their delegees.  *See* 46 U.S.C. § 53105(f).  A replacement vessel must meet then-current eligibility requirements.

9.      This case involves MARAD's approval of a vessel known as the CMA CGM DAKAR ("DAKAR") for inclusion in the MSP Fleet under MSP Operating Agreement No. MA/MSP-57.

10.      MARAD approved the DAKAR in an order dated June 15, 2022 (the "2022 Approval Order").

11.      The DAKAR is operated by APL Lines, Inc., APL Marine Services, Ltd., and APL Maritime, Ltd. (together, "APL").

12.      The DAKAR is ineligible for MSP subsidies because it engages in impermissible transportation of cargo between points in the United States and its territories in violation of 46 U.S.C. § 53105(a)(2), it does not operate exclusively either in foreign trade or in mixed foreign trade and domestic trade permitted under a registry endorsement issued pursuant to 46 U.S.C. § 12111 in violation of 46 U.S.C. § 53105(a)(1)(A), and it operates in impermissible coastwise trade in violation of 46 U.S.C. § 53105(a)(1)(B).  Accordingly, the 2022 Approval Order is contrary to law.

13.     Insofar as the DAKAR does not yet engage in such impermissible trade, the 2022 Approval Order is unlawful in that it authorizes the DAKAR to engage in trade not permitted under the MSA.

14.     Matson seeks judicial review of the 2022 Approval Order on the grounds that it was arbitrary, capricious, and an abuse of discretion within the meaning of the Administrative Procedure Act, 5 U.S.C. § 701 et seq. (the "APA"), and was otherwise contrary to law or unsupported by substantial evidence in the administrative record. *See* 5 U.S.C. § 706.

15.     For the reasons summarized above and explained more fully below, Matson respectfully requests that this Court hold unlawful, vacate, terminate, and set aside the 2022 Approval Order.

## JURISDICTION AND VENUE

15.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331. This Court is authorized to issue the non-monetary relief sought herein pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and the APA, 5 U.S.C. §§ 702, 705, 706.

16.     The 2022 Approval Order is "final" for purposes of the APA, 5 U.S.C. § 701 et seq. This action is timely because it is brought within six years after the 2022 Approval Order was issued. *See* 28 U.S.C. § 2401(a).

17.     Contrary to this Court's ruling regarding a similar vessel approval in a prior proceeding, *see Matson Navigation Co. v. U.S. Dep't of Transp.*, 466 F. Supp. 3d 177 (D.D.C. 2020), the 2022 Approval Order was not "authorized" by any of the statutes listed in the Hobbs Act, 28 U.S.C. § 2342, including 46 U.S.C. § 50501, *see Matson Navigation Co. v. U.S. Dep't of Transp.*, 895 F.3d 799, 804 (D.C. Cir. 2018).

18.     The applicable test for jurisdiction as set forth in *National Ass'n of Manufacturers v. Department of Defense*, 138 S. Ct. 617 (2018), is that jurisdiction will lie in the court of appeals

4

only if  the challenged action was taken "by reason of the authority of" a statute listed in the relevant provisions as giving rise to jurisdiction in the courts of appeals.

19.     The approval of the DAKAR as a replacement vessel is not authorized by Section 50501, even though Appendix A to the 2022 Approval Order cites to that statutory provision. Invoking the definition provision of Section 50501 does not implicate the Hobbs Act, and an agency may not control the forum for review simply by citing or not citing a particular statutory provision.  *See Media Access Project v. FCC*, 883 F.2d 1063, 1067 (D.C. Cir. 1989) ("[I]f a particular statutory provision gives an agency authority, it actually has that authority whether or not it states that it acts pursuant to that statutory provision.").

20.     Matson was not required to exhaust its administrative remedies before filing suit as to the 2022 Approval Order.  MARAD's implementing regulations require, and authorize, administrative appeals only by MSP "Contractors," and MARAD ruled in a prior proceeding that Matson is not a Contractor entitled, or required, to invoke the administrative appeal process. Similarly, Matson cannot have waived or forfeited any allegation or argument by not previously presenting it to the agency, because there was and is no process by which such presentation could have been made.

21.     Venue is proper in this judicial district under 28 U.S.C. § 1391(d) because Defendants are agencies of the United States, they reside in this judicial district, and a substantial part of the events or omissions giving rise to this action occurred in this district.

## PARTIES

22.     Plaintiff Matson provides ocean freight carrier services from the U.S. west coast to Alaska, Asia, Hawaii, Guam, the Northern Mariana Islands (which include Saipan), and other ports of call in the Pacific Ocean.  Matson has been providing ocean freight carrier services in the Pacific region since 1882.  Matson is a Hawaii corporation that maintains its headquarters in Honolulu,

Hawaii.  Matson is a wholly owned subsidiary of Matson, Inc., a publicly traded Hawaii corporation.

23.     Defendant Department of Transportation is an executive agency of the United States government, headed by the Secretary of Transportation.  The Secretary of Transportation is authorized by statute to establish the MSP, award operating agreements, make payments under the MSP, and prescribe rules in order to implement the MSP.  46 U.S.C. §§ 53101–53111.

24.     Defendant MARAD is an administrative agency within the Department of Transportation, led by the Maritime Administrator.  The Secretary of Transportation has delegated the administration of the MSP to the Maritime Administrator.  49 C.F.R. § 1.93(a).  As a result, MARAD has the responsibility to prescribe regulations, determine vessels' eligibility for the MSP, award operating agreements under the MSP, and approve vessels.

25.     Non-party APL Lines, Inc. is a shipping company organized in Delaware.  APL Lines, Inc. is owned, through a series of subsidiaries, by the French corporation CMA CGM S.A. APL Lines, Inc., APL Marine Service, Ltd., and APL Maritime, Ltd. serve several of the same routes and its vessels call at some of the same ports as Matson's.  Matson and APL are direct competitors in the provision of ocean freight services to Guam and Saipan.

## STATUTORY AND REGULATORY BACKGROUND

I.     **Congress Promotes U.S. Shipping in Domestic Trade Routes**

26.     "From the earliest days of the Republic, Congress has been concerned with stimulating and protecting the growth of an American-built and controlled coastwise Merchant Marine," and has enacted legislation granting preferential treatment to U.S.-built and U.S.-flagged vessels. *Penn. R.R. Co. v. Dillon*, 335 F.2d 292, 295 n.5 (D.C. Cir. 1964) (citing An Act Imposing Duties on Tonnage, 1 Stat. 27–28 (1789)).  Among other things, the federal government has long

promoted the domestic shipping industry by limiting access to trade routes between points within the United States to domestic carriers.

27.    Congress strengthened these long-standing protections for the domestic shipping industry in 1920 by passing the Jones Act.  *See* Merchant Marine Act of 1920, Pub. L. No. 66-261, § 27 (1920).

28.    Now codified at 46 U.S.C. § 55101 et seq., the Jones Act provides that "a vessel may not provide any part of the transportation of merchandise . . . between points in the United States to which the coastwise laws apply, either directly or via a foreign port," unless the vessel was built in the U.S. and is owned by a U.S. citizen, or else an exception applies.  46 U.S.C. § 55102(b); *see also* 46 U.S.C. § 12112.

29.    Because the Jones Act does not authorize subsidies to domestic carriers, it allows the federal government to promote the domestic shipping industry "without direct cost to the taxpayers."  *Indep. U.S. Tanker Owners Comm. v. Lewis*, 690 F.2d 908, 912 (D.C. Cir. 1982).

30.    The Jones Act applies to commerce between points in the United States to which the "coastwise," or domestic shipping, laws apply.  46 U.S.C. § 55102(b).  Violations for the Jones Act can trigger penalties, including the seizure and forfeiture of merchandise from the vessel.  46 U.S.C. § 55102(c).

31.    "[T]he coastwise laws apply to the United States, including the island territories and possessions of the United States," with limited exceptions for American Samoa, the Northern Mariana Islands, and the Virgin Islands.  46 U.S.C. § 55101(a).

32.    Section 502(b) of the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America (the "Northern Mariana Islands Covenant") provides that "[t]he laws of the United States regarding coastal shipments . . .

will apply to the activities of the United States Government and its contractors in the Northern Mariana Islands." 48 U.S.C. § 1801 note (Northern Mariana Islands Covenant § 502(b)); *see also* 46 U.S.C. § 55101(b)(2); Customs Service Ruling HQ 109583 (July 7, 1988) (discussing service between Guam and Saipan, and noting that "the coastwise laws of the U.S. are applicable in the Northern Mariana Islands only to the activities of the U.S. Government and its contractors").

33. Trade between any point in the United States or its territories and Guam is domestic.

34. Trade between any point in the United States or its territories and Saipan is domestic.

35. Federal contractors operating between points in the United States and the Northern Mariana Islands (including Saipan) are engaged in the coastwise trade. An MSP contractor is a federal contractor within the meaning of the Northern Mariana Islands Covenant.

36. A carrier cannot evade the requirements of the coastwise laws, including the Jones Act, by interrupting a voyage between points in the United States with a stop or a transshipment (*i.e.*, a change of vessels) at a foreign port.

37. Indeed, the Jones Act specifically covers shipping between points in the United States "either directly or *via a foreign port*." 46 U.S.C. § 55102(b) (emphasis added). "Congress, seeing how easily the protection to American shipping would be vitiated by a simple transshipment of the same cargo, inserted the words 'either directly or via a foreign port' to prohibit such simple transshipment." *Am. Mar. Ass'n v. Blumenthal*, 590 F.2d 1156, 1165 (D.C. Cir. 1978).

38. A U.S. Customers and Border Protection ("CBP") regulation provides that "[a] coastwise transportation of merchandise takes place, within the meaning of the coastwise laws, when merchandise laden at a point embraced within the coastwise laws ('coastwise point') is

unladen at another coastwise point, regardless of the origin or ultimate destination of the merchandise." 19 C.F.R. § 4.80b(a).

39.     To illustrate, goods originating in Long Beach, California; transported by one vessel to Busan, South Korea; and from there transported by a second vessel to Guam or Saipan constitute a domestic shipment because they originated and terminated at ports in the United States or its territories.

## II.     The Maritime Security Program Promotes U.S. Shipping in Foreign Commerce

40.     The Jones Act protects *domestic* shipping.  "In U.S. foreign commerce, however, such protective legislation is not possible," because the foreign countries with which the United States trades have equal rights to allow their own flagged vessels to carry cargo in such trade. *Indep. U.S. Tanker Owners Comm.*, 690 F.2d at 912.

41.     In order to promote U.S. shipping in foreign commerce and protect U.S.-flagged carriers from the lower construction and labor costs generally enjoyed by foreign carriers, Congress has long authorized subsidies to U.S.-flagged carriers operating in foreign commerce.

42.     For example, in the Merchant Marine Act of 1936, Congress enacted the Construction-Differential Subsidy program ("CDS") and the Operating-Differential Subsidy program ("ODS").  Merchant Marine Act of 1936, 49 Stat. 1985, §§ 501–610 (1936).  For decades, the CDS and ODS programs offset the higher costs of constructing vessels in the United States and employing U.S.-citizen mariners by providing direct subsidies to qualifying carriers that operate in foreign trade.

43.     At the same time, Congress has long prevented subsidized carriers or vessels from engaging in domestic trade, as "[i]t would be grossly unfair to allow U.S. vessels that have received a subsidy . . . to compete with U.S. vessels whose owners paid the full cost of construction in U.S. yards."  *Indep. U.S. Tanker Owners Comm.*, 690 F.2d at 912; *see also* 139 Cong. Rec. H8760

(Nov. 3, 1993) ("Among [the CDS] restrictions is a requirement that subsidized vessels operate exclusively in foreign trade.  This restriction is intended to protect both the operators of unsubsidized vessels in the protected domestic trades and our domestic shipyards that have exclusive right to supply vessels for domestic trades."); *Sea-Land Serv., Inc. v. Dole*, 596 F. Supp. 1143, 1146 (D.D.C. 1984) (describing "the clear statutory intent" of a previous subsidy program "to protect unsubsidized lines such as plaintiffs here from competition by subsidized lines such as APL on domestic cargo routes").

44.     Limitations on domestic trade for subsidized vessels cannot be evaded by transshipment at a foreign port.

45.     Congress currently subsidizes U.S. carriers engaged in foreign commerce through the MSP.  *See* 46 U.S.C. § 53101 et seq.

46.     Congress created the MSP in the Maritime Security Act of 1996, in order to "meet national defense and other security requirements and maintain a United States presence in *international* commercial shipping."  Pub. L. No. 104-239, § 2 (1996) (now codified at 46 U.S.C. § 53102(a)) (emphasis added).

47.     In creating the MSP, Congress enacted strict eligibility limitations.

48.     Among other things, in order to participate in the MSP, a vessel must "provid[e] transportation in foreign commerce"; be "suitable for use . . . for national defense or military purposes"; and be "commercially viable."  46 U.S.C. § 53102(b)(2), (4).

49.     "Foreign commerce" is defined in the statute as:

(A) commerce or trade between the United States, its territories or possessions, or the District of Columbia, and a foreign country; and

(B) commerce or trade between foreign countries.

46 U.S.C. § 53101(4).

50.     The regulations regarding eligibility for inclusion in the MSP similarly require that a vessel must be "operated or, in the case of a vessel to be purchased or construed, will be operated to provide transportation in the foreign commerce."  46 C.F.R. § 296.11(a)(2).

51.     The regulations define "foreign commerce" as follows:

> Foreign commerce means a cargo freight service, including direct and relay service, operated *exclusively* in the foreign trade or in mixed foreign and domestic trade allowed under a registry endorsement under 46 U.S.C. § 12111 where the origination point or the destination point of any cargo carried is the United States, regardless of whether the vessel provides direct service between the United States and a foreign country, or commerce or trade between foreign countries.

46 C.F.R. § 296.2 (emphasis added).

52.     A registry endorsement under 46 U.S.C. § 12111 permits a vessel to engage in "foreign trade or trade with Guam, American Samoa, Wake, Midway, or Kingman Reef," even if that vessel would not otherwise be eligible to operate in coastwise trade.

53.     Carriers participate in the MSP by entering into "operating agreements" with MARAD for specifically identified vessels.  46 U.S.C. § 53103(a); 46 C.F.R. §§ 296.1, 296.12.

54.     Here too Congress set strict eligibility requirements for MSP operating agreements, requiring that the subsidized vessels "shall be operated exclusively in the foreign commerce or, . . . in mixed foreign commerce and domestic trade allowed under a registry endorsement," and that the vessels "shall not otherwise be operated in the coastwise trade."  46 U.S.C. § 53105(a).

55.     The statute requires carriers participating in the MSP, "as a condition of including any vessel in the Fleet," to "enter into an operating agreement with the Secretary under this section."  46 U.S.C. § 53103(a).

56.     Vessels are thus not eligible for an MSP operating agreement, or inclusion in the MSP Fleet, if they are not operated exclusively in the foreign commerce or in mixed foreign commerce and domestic trade allowed under a registry endorsement, or if they are otherwise

operated in the coastwise trade.  It is a statutory condition of eligibility that, on the date the vessel is admitted to the MSP Fleet, both the vessel and its operator are in compliance with all material terms of the standardized operating agreement.

57.     The National Defense Authorization Act for Fiscal Year 2018, Pub. L. No. 115-91 (2017), among other things, amended 46 U.S.C. § 53105 to include an additional paragraph regarding the eligibility of vessels to participate in the MSP:

> [I]n the case of a vessel, other than a replacement vessel under subsection (f), first covered by an operating agreement after the date of the enactment of the National Defense Authorization Act for Fiscal Year 2018, the vessel shall not be operated in the transportation of cargo between points in the United States and its territories either directly or via a foreign port . . . .

Pub. L. No. 115-91, § 3503, 131 Stat. 1283, 1911 (2017) (codified at 46 U.S.C. § 53105(a)(2) (2017)).

## FACTUAL ALLEGATIONS

**I.      APL Receives MSP Subsidies for Ships Operating in Domestic Trade**

**A.      MARAD's Initial Approval Orders: The APL GUAM and APL SAIPAN**

58.     In January 2005, APL was awarded MSP Operating Agreement Nos. MA/MSP-49 to -57, allowing nine of APL's vessels to operate under the MSP.  *See* Ex. 1.*

59.     On December 4, 2014, APL applied to MARAD for a determination that it could replace two vessels under its MSP Operating Agreements with unspecified, smaller vessels.  Ex.

---

*       All exhibits to the complaint are from documents from the administrative record provided by MARAD in prior litigation, or provided directly by MARAD in connection with the 2022 Approval Order.  On March 15, 2022, Matson filed a request pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 and 49 C.F.R. § 7, seeking documents related to the administrative proceedings at issue here.  MARAD has not yet produced documents in response to those requests.  Matson may amend its complaint after MARAD completes its FOIA production and any disputes regarding redactions have been resolved.

2.  Whereas the existing vessels operated in the Middle East, the proposed replacement vessels would operate in the Pacific Ocean.  *Id.* at 3–4.

60.     In its initial application, APL indicated that it would operate at least one of the replacement vessels in service to Guam—a service APL had not offered for nearly two decades. Ex. 2, at 5–6.

61.     APL did not make any representations about transportation of cargo originating in the United States or its territories to Saipan (a U.S. territory in the Mariana Islands), or transportation of cargo originating in Saipan to other parts of the United States.  Ex. 2.

62.     APL argued that although the carriage of cargo between the continental United States and Guam constitutes domestic trade, this did not make it ineligible for MSP subsidies because "'MSP vessels may be operated in mixed foreign commerce and domestic trade allowed under a registry endorsement,'" and Guam is among the ports authorized to be called under a registry endorsement.  Ex. 2, at 5.

63.     Unlike Guam, Saipan is not among the ports listed in 46 U.S.C. § 12111 that may be called under a registry endorsement.

64.     MARAD approved APL's initial application in principal in January 2015.  Ex. 3, at 1–2.

### 1.      MARAD Approves the APL GUAM for the MSP

65.     On August 27, 2015, APL represented to MARAD that it had located a suitable and qualified replacement for one of its existing MSP vessels.  APL proposed to substitute in a vessel then known as the NEW DYNAMIC and requested a determination that the NEW DYNAMIC was eligible under MSP and was an acceptable replacement vessel for one of APL's existing MSP vessels.  Ex. 4.

66.     APL indicated that the replacement vessel would carry cargo to and from Guam, but made no representations about, or reference to, the vessel's anticipated transportation of domestic cargo to or from Saipan.

67.     On September 11, 2015, MARAD determined that the NEW DYNAMIC was eligible for the MSP.   MARAD stated that it had "determined that the Vessel meets the requirements of 46 U.S.C. § 53102(b) and 46 C.F.R. § 296.11," but offered no examination of the requirements for eligibility, including whether the vessel would be engaged in foreign commerce within the meaning of the statute and the regulations.  Ex. 5, at 1.

68.     On September 16, 2015, APL requested formal approval to replace one of its MSP vessels (the APL CYPRINE) with the NEW DYNAMIC, which would be renamed the APL GUAM, under MSP Operating Agreement No. MA/MSP-54.  Ex. 6.

69.     On October 22, 2015, MARAD issued a letter to APL approving the substitution of the APL GUAM in place of the APL CYPRINE (the "2015 Approval Order").  Ex. 7.

70.     The letter included no discussion of the APL GUAM's anticipated transportation of cargo originating in the United States or its territories to Saipan, or transportation of cargo originating in Saipan to other parts of the United States.

71.     Matson was not given formal notice of APL's application to substitute the APL GUAM for the APL CYPRINE, nor was it given an opportunity to participate in the administrative proceedings approving the subsidy award.

72.     The APL GUAM in fact carried cargo originating from the United States west coast, operating in service between Yokohama, Japan; Busan, South Korea; Guam; and Saipan, in the Northern Mariana Islands.  Ex. 8, at 2.

## 2.     MARAD Approves the APL SAIPAN for the MSP

73.     On August 24, 2016, APL sought approval in principle to replace a second of its MSP vessels with another vessel to be operated "alongside the APL GUAM in APL's existing US-flag service of Guam and Saipan via Korea."  Ex. 9, at 1.

74.     On October 11, 2016, APL supplemented its August 24, 2016 application, representing that it had identified a vessel, the ELISA DELMAS, suitable for substitution in place of an existing MSP vessel.  Ex. 10.

75.     APL represented that the ELISA DELMAS would operate under MSP Operating Agreement No. MA/MSP-57.  Ex. 10.

76.     On November 9, 2016, MARAD responded to APL's August 24, 2016 application and approved the substitution in principle, provided the substituted vessel met all MSP eligibility requirements.  Ex. 11.  MARAD did not address whether the substituted vessel would operate in foreign commerce.

77.     On November 15, 2016, MARAD responded to APL's October 11, 2016 application and determined that the ELISA DELMAS met the requirements of 46 U.S.C. § 53102(b) and 46 C.F.R. § 296.11.  Ex. 12.  MARAD did not otherwise discuss the issue of whether the ELISA DELMAS would operate in foreign commerce.

78.     On December 9, 2016, an internal memorandum was circulated within MARAD recommending that MARAD formally approve APL's request to substitute the ELISA DELMAS, to be renamed the APL SAIPAN, in place of the APL AGATE.  Ex. 13.

79.     With respect to the statutory requirement that an MSP vessel operate in foreign commerce, the memorandum stated:

> 46 U.S.C. § 53102(b)(2), further clarified by 46 U.S.C. § 53105(a)(1)(A) requires that an eligible vessel be operated exclusively in the foreign commerce or in mixed foreign commerce and domestic trade allowed under a registry endorsement issued under section 12111 of title 46, United States Code.  Under 46 U.S.C. § 12111(b),

a registry endorsement entitles a U.S. operator to engage in foreign trade or domestic trade with Guam, American Samoa, Wake, Midway or Kingman Reef. APL will time charter the Replacement Vessel from APLMS for operation in its established worldwide services, with mixed foreign commerce and domestic trade to Guam provided in accordance with the Replacement Vessel's registry endorsement. Accordingly, it has been determined that the Replacement Vessel will provide transportation in foreign commerce, thereby meeting the requirements of 46 U.S.C. § 53102(b)(2).

Ex. 13, at 4.

80.     The memorandum included no discussion about the APL SAIPAN's anticipated transportation of cargo originating in the United States or its territories to Saipan, or transportation of cargo originating in Saipan to other parts of the United States.

81.     MARAD adopted those recommendations, and on December 20, 2016, approved the substitution of the APL SAIPAN in place of the AGATE (the "2016 Approval Order"). Ex. 14.

82.     The letter included no discussion about the APL SAIPAN's anticipated transportation of cargo originating in the United States or its territories to Saipan, or transportation of cargo originating in Saipan to other parts of the United States. In fact, with the exception of the vessel's name, the letter contained no discussion of Saipan at all.

83.     The APL SAIPAN in fact carried cargo originating from the United States west coast, operating in service between Yokohama, Japan; Busan, South Korea; Guam; and Saipan, in the Northern Mariana Islands. Ex. 8, at 2.

84.     The APL AGATE, having been replaced, stopped operating in December 2016, and was scrapped in early 2017.

### B.    Matson Files APA Challenge To The APL GUAM and APL SAIPAN

85.    Following MARAD's formal approval of the APL SAIPAN, Matson attempted to challenge the approvals of both the APL GUAM and the APL SAIPAN by administrative appeal on February 17, 2017.

86.    On April 7, 2017, MARAD rejected the administrative appeal on the ground that Matson lacked standing under 46 C.F.R. § 296.50(a) because it is not a "Contractor" within the meaning of the operative regulations.  Ex. 15, at 1.

87.    MARAD also discussed the merits of the administrative appeal, dismissing, *inter alia*, Matson's argument that the replacement vessels' transport of cargo originating in and destined for the United States made them ineligible for the MSP.  Ex. 15, at 2.

88.    MARAD did not discuss or acknowledge the replacement vessels' transport of cargo to and from Saipan.

89.    Matson petitioned for review of MARAD's appeal determination in the United States Court of Appeals for the D.C. Circuit.  APL intervened.  Both MARAD and APL argued that the Court of Appeals lacked jurisdiction to hear Matson's appeal and that the case should be brought instead in district court.  After briefing, argument, and supplemental briefing, the Court of Appeals dismissed the appeal for lack of jurisdiction.  *See* Ex. 16.

90.    With respect to the 2015 Approval Order regarding the APL GUAM, the D.C. Circuit noted that although "MARAD's 'explicit reliance' on section 50501 *could* provide this court with jurisdiction under the Hobbs Act over the 2015 approval," the Court had "*no occasion to decide this question*" because it found that Matson's challenge to the 2015 Approval Order was untimely.  *Matson*, 895 F.3d at 804–05 (emphases added).

91.    With respect to the 2016 Approval Order regarding the APL SAIPAN, the D.C. Circuit noted that "MARAD never explicitly invoked Section 50501 in reaching its eligibility

determination." *Matson*, 895 F.3d at 805.  Moreover, the Court held that even "[a]ssuming that MARAD *implicitly* made a Section 50501 finding in order to approval APL's second replacement request pursuant to section 53105(f), the 2016 Approval Order does not 'interpret' Section 50501 citizenship," and because there was "no indication that the 2016 Approval Order was issued pursuant to section 50501 or other any statute listed in the Hobbs Act," the Court of Appeals "lack[ed] exclusive jurisdiction to consider Matson's challenge, and it must initially pursue its challenge in the district court."  *Id.* at 806 (emphasis added).

92.     Following the dismissal in the D.C. Circuit, Matson filed suit in this Court challenging the approvals of both the APL GUAM and the APL SAIPAN.

93.     Matson argued principally that the vessels were ineligible for inclusion in the MSP because they each provided transportation in domestic commerce of goods to and from Saipan, which is domestic trade not permitted under a registry endorsement under 46 U.S.C. § 12111.

94.     APL intervened in those proceedings.

95.     Matson moved for summary judgment, as did MARAD.  In addition to moving for summary judgment, MARAD filed a motion to dismiss the challenge to the 2015 Approval Order, arguing that the court of appeals actually *did* have jurisdiction pursuant to the Hobbs Act, but that Matson's initial petition for review in the D.C. Circuit had been untimely.

96.     On May 30, 2020—and amended on June 12, 2020—this Court granted MARAD's motion to dismiss the challenge to the 2015 Approval Order (for the APL GUAM), but granted summary judgment to Matson on its challenge to the 2016 Approval Order (for the APL SAIPAN). Ex. 17.

97.     With respect to the APL GUAM, the Court held that pursuant to the Hobbs Act, 28 U.S.C. § 2342, the federal courts of appeals had exclusive jurisdiction over any challenge to the

2015 Approval Order.  The Court reasoned that because MARAD had cited 46 U.S.C. § 50501 in its approval order of the APL GUAM, and because 46 U.S.C. § 50501 is a statute listed in the Hobbs Act as requiring review in the D.C. Circuit, jurisdiction was exclusively in the federal courts of appeals. Ex. 17, at 17–18.

98.     With respect to the APL SAIPAN, the Court held that it could not "discern the basis for MARAD's 2016 determination respecting the APL Saipan," and as a result, the "agency either completely failed to explain its reasons for approving the replacement or entirely failed to consider an important aspect of the question before it and thus failed to comply with the APA."  Ex. 17, at 2–3.

99.     On June 30, 2020, the Court vacated the approval of the APL SAIPAN.  Ex. 18.

100.    On July 17, 2020, Matson filed a timely appeal from the portion of the Court's order finding that it lacked jurisdiction to consider Matson's challenge to the approval of the APL GUAM.

101.    In an abundance of caution, Matson also filed a motion to certify the Court's jurisdictional order for interlocutory appeal.

102.    After supplemental briefing, on August 19, 2020, the Court issued an order certifying its jurisdictional order as a partial final judgment pursuant to Fed. R. Civ. P. 54(b). Matson filed a timely notice of appeal, and that appeal was consolidated with the first appeal.

**C.    APL SAIPAN Remand Proceedings and 2020 Approval Order**

103.    Following vacatur of MARAD's 2016 approval of the APL SAIPAN, neither MARAD nor APL advised Matson of whether or when remand proceedings before the agency would begin.

104.    On July 13, 2020, Matson submitted to MARAD a letter outlining several reasons why the APL SAIPAN could not be approved for inclusion in the MSP, including because its

domestic trade with Saipan rendered it ineligible for the MSP Fleet, as did the vessel's age.  Ex.
19.

107.    In addition to its written submission, Matson also filed a formal Petition to
Intervene, incorporating the procedural arguments it made in its written submission regarding its
inability to participate.  Ex. 20.

106.    On August 3, 2020, MARAD sent counsel for Matson a letter denying Matson's
Petition to Intervene.  Ex. 21.

107.    On August 4, 2020, MARAD sent counsel for Matson the 2020 Approval Order,
dated August 3, 2020, approving the APL SAIPAN for inclusion in the MSP.  The 2020 Approval
Order was memorialized in a single-page letter, and relied on an attached Staff Memorandum and
Chief Counsel Memorandum.  Ex. 22.

108.    The 2020 Approval Order noted:

[W]ith respect to operations in Saipan, while the coastwise laws generally do not
apply to the Commonwealth of the Northern Mariana Islands (CNMI), our review
of the Covenant To Establish a Commonwealth of the Northern Mariana Islands in
Political Union with the United States of America (Covenant) indicates that: 1)
*commercial cargo* may be transported between U.S. ports and the CNMI on
U.S.-flag vessels such as the APL SAIPAN with registry endorsements; and 2) the
carriage of *U.S. Government cargo* between U.S. ports and the CNMI must be
undertaken on U.S.-flag vessels with coastwise endorsements.

Ex. 22, at 1.

109.    The Chief Counsel Memorandum attached to the 2020 Approval Order noted that
"[b]ecause the APL SAIPAN met the age requirement when (1) APL sought the Approval, (2)
MARAD issued the Approval, and (3) the Vessel entered the Fleet, the Court's order did not
constitute a permanent ban of the Vessel from the Fleet" and the fact that the APL SAIPAN "is
now older than the 15 years specified in section 53102(b)(3)(B)" did not make it ineligible.  Ex.

23, at 9, 11.  The Staff Memorandum incorporated this analysis in finding that the APL SAIPAN

met the age requirement of Title 46 U.S.C. § 53102(b)(3)(B).  Ex. 24 at 9–10.

110.    On September 30, 2020, Matson filed a complaint in this Court challenging the

2020 Approval Order.  *See Matson Navigation Co. v. Dep't of Transp.*, No. 20-cv-2779 (2020).

111.    Matson also filed a petition for review of the 2020 Approval Order in the D.C.

Circuit.  *Matson Navigation Co. v. Dep't of Transp.*, No. 20-1395.

**D.    MARAD Replaces The APL Guam With the HERODOTE**

112.    On January 12, 2021, APL sought approval to replace the APL GUAM with the

HERODOTE under MSP Operating Agreement No. MA/MSP-54.

113.    Neither MARAD nor APL notified Matson of the application to approve the

HERODOTE as a subsidized replacement vessel.

114.    On March 18, 2021, MARAD responded to APL's January 12, 2021 application

and determined that the HERODOTE met the requirements of 46 U.S.C. § 53102(b) and 46 C.F.R.

§ 296.11.  Ex. 25.  MARAD did not otherwise discuss the issue of whether the HERODOTE would

operate in foreign commerce.

115.    On April 14, 2021, an internal memorandum was circulated within MARAD

recommending that MARAD formally approve APL's request to substitute the HERODOTE in

place of the APL GUAM.  Ex. 26.

116.    With respect to the statutory requirement that an MSP vessel operate in foreign

commerce, the memorandum stated:

> 46 U.S.C. § 53102(b)(2) requires that Fleet-eligible vessels must be operated in
> providing transportation in foreign commerce.  APLM intends to operate the
> HERODOTE in APLM's Western Pacific trade routes pursuant to a registry
> endorsement, including to the Commonwealth of the Northern Mariana Islands
> ("CNMI").  MARAD notes that United States-registered vessels holding registry
> endorsements may trade commercially with CNMI, in accordance with 46 U.S.C.
> § 55101(b)(2).  However, any such vessel must abide by Sec. 502(b) of the

> Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America (48 U.S.C. § 1801 note) ("CNMI Covenant"), which applies the requirements of the coastwise laws to U.S. Government shipments moving between U.S. states and territories and CNMI (except Guam, pursuant to a recent ruling by U.S. Customs and Border Protection ("CBP")). Pursuant to MARAD's request, APLM has confirmed that it will not be carrying U.S. Government cargo that is subject to the coastwise laws between U.S. states and territories and CNMI, except as permitted by CBP. Therefore, the HERODOTE will provide transportation in foreign commerce, satisfying the Fleet vessel operational requirements of 46 U.S.C. § 53102(b)(2).

Ex. 26, at 4–5.

117.    The memorandum did not separately discuss the regulatory requirements except to say that they mirrored the statutory ones. Ex. 26, at 7.

118.    On April 26, 2021, MARAD issued the 2021 Approval Order approving the substitution of the HERODOTE in place of the APL GUAM. Ex. 27.

119.    In approving APL's request, MARAD made the determinations recommended by the internal memorandum regarding the HERODOTE's compliance with the statutory eligibility requirements. Ex. 27, at 1–2.

120.    MARAD also determined that the HERODOTE complied with the regulatory eligibility requirement. Ex. 27, at 3.

121.    MARAD recognized the applicability of its own regulation that operating exclusively in foreign commerce is a legal prerequisite for admitting a vessel into the MSP Fleet.

122.    APL's request was approved 14 days before oral argument in the D.C. Circuit on Matson's appeal of the Court's jurisdictional order on the 2015 Approval Order.

123.    After the parties advised the D.C. Circuit panel hearing Matson's appeal from the jurisdictional determination of the approval of the HERODOTE, the D.C. Circuit vacated the district court's jurisdictional order in light of the mootness caused by MARAD and APL. Ex. 28.

**E.     Matson files an APA Challenge to the HERODOTE**

124.   Matson has instituted a district court proceeding challenging the HERODOTE's inclusion in the MSP Fleet.  *See* Complaint, *Matson Navigation Co. v. Dep't of Transp.*, No. 21-cv-1606 (D.D.C. June 14, 2021).  MARAD has moved to dismiss that complaint for lack of jurisdiction.  The motion to dismiss is fully briefed.

### F.   Further APL SAIPAN Proceedings

#### 1.   2020 Approval Order Litigation

125.   On December 22, 2020, Matson moved for summary judgment on its challenge of the 2020 Approval Order approving the substitution of the APL SAIPAN for inclusion in the MSP Fleet.

126.   On January 19, 2021, MARAD moved for a 60-day stay to allow for review of the issues by the incoming Presidential Administration.

127.   On April 9, 2021, MARAD moved for a voluntary remand.  Ex. 29.

128.   MARAD acknowledged that its conclusion that the APL SAIPAN was of an adequate age in 2020 was incorrect and in error.  Ex. 29, at 7.

129.   MARAD represented that it did not anticipate reapproving the APL SAIPAN as a substitute vessel for inclusion in the MSP Fleet, but also stated that it would consider any arguments raised during subsequent vessel replacement proceedings on remand.  Ex. 29, at 9 & n.1.

130.   Matson did not oppose MARAD's motion for a voluntary remand provided that the 2020 Approval Order was vacated and the district court retained jurisdiction over the case.  Ex. 30.

131.   APL opposed the motion for voluntary remand, contending that MARAD's confession of error was itself incorrect and that remand would prejudice APL by avoiding a merits decision from the court.  Ex. 31.

132.    On July 9, 2021, MARAD filed a notice stating that in late June 2021, it received an initial application from APL "to replace the APL SAIPAN pursuant to 46 U.S.C. § 53105(f) and APL's operating agreement." Ex. 32, at 1.

133.    MARAD represented that "APL has stated that the replacement vessel would be operated under the U.S.-flag in the APL Jebel Ali-Middle East Express Service in the Arabian Gulf, which is operated in conjunction with APL's U.S.-flag Middle East Service." Ex. 32, at 1.

134.    The Court held a hearing on August 4, 2021. At oral argument, APL told the district court that the approval of the replacement vessel would moot the pending challenge to the APL SAIPAN, because "the issues that [the case] is presenting simply no longer would be on the table with respect to a new vessel, which there would not be an age issue, and it's not even intended for the same service. It's intended for a service that, at least as far as I'm aware, Matson doesn't participate in." Ex. 33, at 22–23.

135.    In an oral order following the hearing, the Court declined to vacate the 2020 Approval Order, instead making it clear that the decision whether or not to vacate the order would be left to the agency. Ex. 33, at 28–29.

136.    The Court also gave MARAD 60 days to conduct any proceedings on remand, and retained jurisdiction over the matter. Ex. 33, at 29.

137.    Finally, the Court directed MARAD to at least give Matson "notice of procedurally what is happening with respect to the remand" and the Justice Department agreed to convey Matson's request for fuller participation. Ex. 33, at 31.

### 2.    The Second APL SAIPAN Remand

138.    On August 6, 2021, Matson submitted a letter to MARAD requesting (1) that the agency "immediately vacate its December 2020 order purporting to approve the APL SAIPAN for inclusion in the MSP Fleet," and (2) "that Matson be permitted to intervene and fully participate

in any further administrative proceedings regarding the APL SAIPAN and any replacement vessel applications." Ex. 34, at 1.

139.    Matson contended that in "light of the positions taken by the government on the record, the 2020 [Approval O]rder should not remain 'on the books' for even one more day," as it was "unlawful when entered, it is unlawful today, and it will be unlawful tomorrow." Ex. 34, at 2.

140.    Matson further sought leave to intervene and fully participate in the remand proceedings, consistent with MARAD's own regulations.  Ex. 34, at 3 (citing 5 U.S.C. § 555(b); 46 C.F.R. § 201.78; and *Block v. SEC*, 50 F.3d 1078, 1085 (D.C. Cir. 1995)).

141.    Rather than vacating the 2020 Approval Order, on August 9, 2021, MARAD solicited comments from both APL and Matson regarding whether the APL SAIPAN meets the vessel age requirement of 46 U.S.C. § 53102(3)(B).  Ex. 35.

142.    Matson submitted its comments on August 23, 2021, arguing that MARAD was bound by its confession of error with respect to its prior conclusion that the APL SAIPAN was of an adequate age in 2020.  Ex. 36, at 2–3.

143.    Matson also contended that there is no lawful basis for reapproval of the APL SAIPAN.  Because the district court vacated the original 2016 Approval Order, the vessel was not admitted into the fleet until it was older than 15 years of age, and the 2020 Approval Order did not have and could not have had retroactive effect.  Ex. 36, at 3–4.

144.    On September 1, 2021, MARAD informed counsel for Matson that "APL has informed MARAD it now intends to operate the replacement vessel [for the APL SAIPAN], if approved, in the same trades as the APL SAIPAN."  Ex. 37.

145.    MARAD further represented that "APL has confirmed to MARAD that the replacement vessel will not carry U.S. Government cargo between Saipan and other U.S. ports, except as permitted by Customs and Border Protection." Ex. 37.

146.    MARAD did not provide this replacement vessel application to Matson, nor any other information about the proposed replacement vessel.

147.    On September 15, 2021, Matson submitted its response to MARAD's invitation to submit comments regarding the replacement vessel application. Ex. 38.

148.    Matson argued that MARAD violated the Due Process Clause, the Administrative Procedure Act, and its own regulations by not providing Matson with any information regarding the replacement vessel or the application and not allowing it to fully participate in the remand proceedings. Ex. 38, 15–18.

149.    Matson also argued that the replacement vessel was ineligible for MSP subsidies because of its anticipated trade with Saipan. Ex. 38, at 19–21.

150.    Further, Matson contended that the replacement vessel could not qualify as a replacement vessel under 46 U.S.C. Section 53105(f) because (1) to the extent it purported to replace the APL SAIPAN, that vessel was never lawfully included in the MSP Fleet; and (2) to the extent it purported to replace the AGATE, that vessel had been out of service since 2016 and never operated in the Guam or Saipan trade. Ex. 38, at 21–22.

**G.    DAKAR Approval Proceedings**

**1.    2022 Approval Order**

151.    On June 22, 2021, APL sought approval to replace the AGATE (the predecessor vessel to the APL SAIPAN) with the DAKAR under MSP Operating Agreement No. MA/MSP-57, and supplemented its application on October 1, 2021.

152.     On October 1, 2021, MARAD permanently ejected the APL SAIPAN from the MSP Fleet.

153.     On March 16, 2022, MARAD and Matson stipulated to the voluntary dismissal without prejudice of Matson's challenge to the 2020 Approval Order (approving the APL SAIPAN).

154.     On June 15, 2022, MARAD issued the 2022 Approval Order approving the substitution of the DAKAR in place of the AGATE.  Ex. 39.

155.     In approving APL's request, MARAD made the following determinations regarding the DAKAR's compliance with the statutory eligibility requirements:

(A) Found that the proposed vessel ownership and operational structure for the DAKAR as detailed in Appendix A, attached, meets the citizenship requirements for owners, charterers, and operators of Fleet vessels under 46 U.S.C. § 53102(c)(2).

(B) In view of (A) above, determined that the DAKAR meets the Fleet vessel control eligibility requirements of 46 U.S.C. § 53102(b)(1).

(C) Noted that: (1) APLMS will operate the DAKAR in established trade in the Western Pacific pursuant to a registry endorsement, but will not carry cargo between any State or Territory of the United States and the Commonwealth of the Northern Mariana Islands, except as permitted by U.S. Customs and Border Protection.

(D) In view of (C) above, determined that the DAKAR will provide transportation in foreign commerce, meeting the Fleet vessel operational requirements of 46 U.S.C. § 53102(b)(2).

Ex. 39, at 1.

156.     Appendix A to the 2022 Approval Order, which describes the DAKAR's ownership structure, states that the DAKAR's "Trustee" is a "50501 Citizen," defined as "a person, partnership, trust, or corporation meeting the definition of the United States citizen under 46 U.S.C. § 50501.  Ex. 40.

157.   In approving APL's request, MARAD made the following determinations regarding the DAKAR's compliance with the regulatory eligibility requirement:

> (K) Noted that: (1) 46 C.F.R. § 296.11(a) implements 46 U.S.C. § 53102(b); (2) the DAKAR meets the Fleet vessel eligibility requirements and qualifications of 46 U.S.C. § 53102(b), as determined and stated above; and (3) determined that the DAKAR satisfies the MSP Operating Agreement replacement vessel requirements of 46 C.F.R. § 296.11(a), and that the Secretary and SecDef granted their approval of the DAKAR as a replacement Fleet vessel, as determined and stated above.

Ex. 39, at 2.

## 2.   The DAKAR is Ineligible for the MSP Fleet

158.   As an initial matter, MARAD appears to now recognize that the exclusivity requirement of Section 53105(a) attaches at the eligibility stage, as it expressly addressed that issue in considering its approval of the HERODOTE.  *See* Ex. 27.

159.   Compliance with Section 53105(a) therefore is a threshold requirement—both legally and practically—to admission into the MSP Fleet.

160.   Despite MARAD's findings otherwise, domestic trade renders the DAKAR ineligible for the MSP Fleet under 46 U.S.C. § 53105(a)(1).

161.   *First*, due to the amendment of the MSA in 2018, new MSP vessels are categorically prohibited from engaging in domestic trade, full stop.

162.   The National Defense Authorization Act for Fiscal Year 2018 ("NDAA"), enacted on December 17, 2017, amended the MSA to provide:

> [I]n the case of a vessel, other than a replacement vessel under subsection (f), first covered by an operating agreement after the date of the enactment of the National Defense Authorization Act for Fiscal Year 2018, the vessel shall not be operated in the transportation of cargo between points in the United States and its territories either directly or via a foreign port[.]

46 U.S.C. § 53105(a)(2).

163.    The 2022 Approval Order was issued after the date of the enactment of the NDAA, and so the DAKAR was "first covered by an operating agreement after" December 17, 2017.  The DAKAR is therefore categorically prohibited from domestic trade unless it qualifies as a "replacement vessel under subsection (f)."

164.    Title 46 U.S.C. § 53105(f) permits an MSP contractor to "replace a vessel under an operating agreement with another vessel that is eligible to be included in the Fleet under section 53102(b), if the Secretary, in conjunction with the Secretary of Defense, approves the replacement of the vessel."  Section 53105(f) can only apply, therefore, when a contractor proposes to replace "a vessel under an operating agreement."

165.    The DAKAR cannot be a replacement vessel under 46 U.S.C. § 53105(f) because the vessel it would purport to replace—the AGATE—has been out of service since December 2016, scrapped since 2017, and never operated in the U.S.-Guam/Saipan trade.

166.    Treating the DAKAR as yet another "replacement vessel," would nullify the congressional intent of the NDAA. Congress made clear its view that vessels in the MSP should not be operating in domestic commerce. The statute was enacted over four years ago and MARAD must heed its mandate.  APL's evergreening strategy, replacing vessels in the MSP Fleet in perpetuity, runs directly counter to the statutory command of the NDAA.

167.    *Second*, even if the DAKAR were a "replacement vessel," trade to and from Saipan is domestic trade not covered by a registry endorsement under 46 U.S.C. § 12111, and therefore prohibited by 46 U.S.C. § 53105(a)(1)(A).

168.    Section 53105(a)(1)(A) is clear on its face:  The *only* domestic trade an MSP vessel may engage in is that "allowed under a registry endorsement issued under section 12111 of [title 46]."  46 U.S.C. § 53105(a)(1)(A).

169.    Section 12111 provides that "[a] vessel for which a registry endorsement is issued may engage in foreign trade or trade with Guam, American Samoa, Wake, Midway, or Kingman Reef." 46 U.S.C. § 12111(b).  Saipan and the Northern Mariana Islands are not among the islands listed in Section 12111(b) that a vessel may call pursuant to a registry endorsement.  The DAKAR's anticipated domestic trade to and from Saipan therefore constitutes domestic trade not authorized by a registry endorsement issued under Section 12111.

170.    Service between Saipan and the U.S. mainland is not contemplated by Section 12111, yet it is undisputedly domestic trade within the meaning of the MSA.  *Cf.* 46 U.S.C. § 53101(10).  It is domestic trade not permitted under Section 53105(a)(1)(A).

171.    The 2022 Approval Order authorizes the DAKAR to engage in trade "between any State or Territory of the United States and the Commonwealth of the Northern Mariana Islands" if permitted by U.S. Customs and Border Protection.

172.    Such domestic trade is not authorized under the MSA, regardless of whether it is permitted by U.S. Customs and Border Protection.

173.    In its correspondence alerting Matson of APL's application to replace the APL SAIPAN, MARAD advised that "APL has informed MARAD it now intends to operate the replacement vessel, if approved, in the same trades as the APL SAIPAN."

174.    The APL SAIPAN, while it was in operation in the U.S.-Guam/Saipan trade, engaged in domestic trade between Saipan and other points in the United States, including the West Coast.

175.    Based upon this representation, APL intends to operate the DAKAR in impermissible domestic trade between Saipan and other points in the United States, including the West Coast.

176.    *Third*, the DAKAR's domestic trade to and from Saipan is coastwise trade prohibited by Section 53105(a)(1)(B), because pursuant to the Northern Mariana Islands Covenant, the coastwise laws apply to the "activities of the United States government and its contractors in the Northern Mariana Islands." 48 U.S.C. § 1801 note.

177.    Section 502(b) of the CNMI Covenant provides that although the coastwise laws do not generally apply to vessels operating in domestic trade in the Northern Mariana Islands, the coastwise laws *do* apply to "the activities of the United States and its contractors in the Northern Mariana Islands." 48 U.S.C. § 1801 note (CNMI Covenant § 502(b)).

178.    All MSP operators, including APL, must enter into a contract with the United States in order to receive subsidies under the MSP.

179.    The DAKAR's anticipated carriage to Saipan will necessarily be conducted pursuant to its contract with the United States, because the vessel must be operated in accordance with an MSP operating agreement—a contract with the United States—in order to obtain subsidies at all.

180.    Every time the DAKAR calls Saipan, then, it will be under contract with the United States government regardless of what cargo (if any) it is carrying.

181.    The drafting history of the CNMI Covenant confirms this interpretation.   The original draft from December 19, 1974 extended the coastwise laws only to "United States government shipments" in the Northern Mariana Islands, that is, the class of shipments MARAD contends is *currently* covered by the coastwise laws.  Joint Resolution to Approve the "Covenant to Establish a Commonwealth of the N. Mariana Islands in Political Union with the U.S.," and for Other Purposes: Hearing Before the Comm. On Interior and Insular Affairs, S.J. Res. 107, 94th Cong. 241 (1975).

182.     But the final version of the CNMI Covenant revised and expanded that exception to apply to "the activities of the United States Government and its contractors in the Northern Mariana Islands" (48 U.S.C. § 1801 note (Section 502(b))), a decidedly broader category. Therefore, the Northern Mariana Islands Covenant cannot be read to apply the coastwise laws only to the shipment of government cargo to and from Saipan.

## II.     Harm to Matson

183.     Matson will suffer economic injury as a result of MARAD's approval of the DAKAR.

184.     Matson and APL are competitors in the Guam and Saipan trades.  Specifically, both Matson and APL operate vessels that transport cargo from the United States and its territories to Guam and Saipan, and from Guam and Saipan to other parts of the United States.

185.     Currently, Matson operates no vessels that receive MSP subsidies, including vessels that provide ocean freight services between other parts of the United States and its island territories of Guam and Saipan.

186.     As a result of the MSP subsidies, APL is able to offer significantly lower prices than Matson for shipping cargo on the same routes, driving carriage from Matson to APL and altering the competitive balance in this domestic trade.

187.     MARAD's decisions have caused and will cause Matson to lose sales, damage its customer relationships, and require Matson to expend more of its own resources to obtain business in the Guam and Saipan trades.  The continued litigation with respect to the MSP program also creates uncertainty for Matson in planning its business.

188.     Matson supports full and fair competition in all of its trade lines, but so long as APL is unlawfully receiving federal subsidies for its operation of the DAKAR, Matson is not competing on a level playing field and will continue to incur injury.

189.    Congress did not and does not intend for vessels operating in the domestic trades, including the transportation of freight to and from Pacific island territories, to receive MSP subsidies.

### COUNT I
### (Administrative Procedure Act – Impermissible Domestic Trade in Violation of 46 U.S.C. § 53105(a)(2))

190.    Matson incorporates the preceding paragraphs as if fully set forth herein.

191.    The 2022 Approval Order authorizes the DAKAR to engage in impermissible domestic trade in violation of 46 U.S.C. § 53105(a)(2).

192.    The DAKAR in fact engages in impermissible domestic trade in violation of 46 U.S.C. § 53105(a)(2).

193.    46 U.S.C. § 53105(a)(2) provides:

[I]n the case of a vessel, other than a replacement vessel under subsection (f), first covered by an operating agreement after the date of the enactment of the National Defense Authorization Act for Fiscal Year 2018, the vessel shall not be operated in the transportation of cargo between points in the United States and its territories either directly or via foreign port[.]

194.    The date of the enactment of the NDAA is December 17, 2017.

195.    The 2021 Approval Order was issued after the date of the enactment of the NDAA. Therefore, the DAKAR was "first covered by an operating agreement after the date of the enactment of the National Defense Authorization Act for Fiscal year 2018."

196.    The DAKAR is not a "replacement vessel under subsection (f)."

197.    The AGATE, which is the vessel MARAD states the DAKAR is replacing, has not been in service since 2016 and never operated in the Guam or Saipan trade.

198.    At the time of the 2022 Approval Order, the AGATE was not a "vessel under an operating agreement" within the meaning of Section 53105(f), and the DAKAR therefore is not a "replacement vessel" within the meaning of Section 53105(a)(2).

33

199.    Treating the DAKAR as a "replacement vessel" also would contravene the congressional intent of the NDAA.

200.    Since approval of the MSP subsidy, the DAKAR has operated in the transportation of cargo between points in the United States and its territories either directly or via foreign port, and it will continue to do so.

201.    The DAKAR is thus ineligible for inclusion in the MSP pursuant to 46 U.S.C. § 53105(a)(2), and MARAD's conclusion otherwise is arbitrary, capricious, and not in accordance with the law.

202.    In addition or in the alternative, MARAD failed to address or explain whether or how the DAKAR could operate in domestic trade notwithstanding the prohibition in Section 53105(a)(2).

203.    Matson advised MARAD in its submission to the agency that the DAKAR could not be a replacement vessel for the AGATE.

204.    Nonetheless, the 2022 Approval Order fails to address this issue at all.

205.    MARAD's failure to address an important aspect of the problem and/or to explain its reasoning such that the Court may meaningfully review the Order is arbitrary and capricious and contrary to law.

### COUNT II
**(Administrative Procedure Act – Impermissible Domestic Trade in Violation of 46 U.S.C. §§ 53102(b)(2), 53103(a), 53105(a)(1)(A), 53105(a)(1)(B), 46 C.F.R. §§ 296.2, 296.11(a)(2))**

206.    Matson incorporates the preceding paragraphs as if fully set forth herein.

207.    The DAKAR is ineligible for MSP subsidies because it will operate in impermissible domestic and coastwise trade in violation of the statute and implementing regulations.

208.    In order to be eligible for the MSP, a vessel must "provid[e] transportation in foreign commerce."  46 U.S.C. § 53102(b)(2).

209.    46 U.S.C. § 53105(a)(1)(A) further provides that a vessel operating pursuant to the MSP "shall be operated *exclusively* in the foreign commerce or, . . . in mixed foreign commerce and domestic trade allowed under a registry endorsement issued under section 12111 of this title," and "shall not otherwise be operated in the coastwise trade."  46 U.S.C. § 53105(a)(1) (emphasis added).

210.    46 U.S.C. § 53103(a) provides that "[t]he Secretary shall require, as a condition of including any vessel in the Fleet, that the person that is the owner or operator of the vessel . . . enter into an operating agreement with the Secretary under this section."

211.    "Foreign commerce" is defined as "commerce or trade between the United States, its territories or possessions, or the District of Columbia, and a foreign country," and "commerce or trade between foreign countries."  46 U.S.C. § 53101(4).

212.    46 C.F.R. § 296.11(a)(2) similarly provides that a "vessel is eligible to be included in an MSP Operating Agreement if . . . [t]he vessel is operated or, in the case of a vessel to be purchased or constructed, will be operated to provide transportation in the foreign commerce."

213.    "Foreign commerce" is defined as:

a cargo freight service, including direct and relay service, operated *exclusively* in the foreign trade or in mixed foreign and domestic trade allowed under a registry endorsement under 46 U.S.C. [§] 12111 where the origination point or the destination point of any cargo carried is the United States, regardless of whether the vessel provides direct service between the United States and a foreign country, or commerce or trade between foreign countries.

46 C.F.R. § 296.2 (emphasis added).

214.    The DAKAR will provide transportation in domestic trade between the rest of the United States and Saipan.

215.    The 2022 Approval Order expressly permits the DAKAR to provide transportation in the domestic trade between the rest of the United States and Saipan.

216.    Saipan is part of the United States as defined at 46 U.S.C. § 53101(10).  Vessels that transport cargo originating in the continental United States to Saipan, or transport cargo originating in Saipan to the continental United States, are therefore not engaged in foreign commerce within the meaning of 46 U.S.C. §§ 53101, 53102, and 53105, and 46 C.F.R. §§ 296.2 and 296.11.

217.    Saipan is not a territory for which domestic trade is allowed under a registry endorsement issued under 46 U.S.C. § 12111.

218.    46 U.S.C. § 12111(b) provides that "[a] vessel for which a registry endorsement is issued may engage in foreign trade or trade with Guam, American Samoa, Wake, Midway, or Kingman Reef."

219.    Because the DAKAR will engage in domestic trade that is not covered by a registry endorsement pursuant to 46 U.S.C. § 12111, it will not operate "exclusively in the foreign commerce, or, . . .  in mixed foreign commerce and domestic trade allowed under a registry endorsement issued under section 12111 of this title," as required by 46 U.S.C. § 53105(a)(1)(A).

220.    Because the DAKAR will engage in domestic trade that is not covered by a registry endorsement pursuant to 46 U.S.C. § 12111, it will not operate "exclusively in the foreign trade or in mixed foreign and domestic trade allowed under a registry endorsement under 46 U.S.C. [§] 12111," as required by 46 C.F.R. §§ 296.2, 296.11.

221.    The DAKAR is therefore ineligible for inclusion in the MSP, and the 2022 Approval Order approving the DAKAR for inclusion in the MSP and authorizing the DAKAR to engage in domestic trade is arbitrary, capricious, and not in accordance with the law.

222.    In addition or in the alternative, the 2022 Approval Order authorizes impermissible coastwise trade in violation of Section 53105(a)(1)(B).

223.    The MSA provides that a participating vessel "shall not otherwise be operated in the coastwise trade."  46 U.S.C. § 53105(a)(1)(B).

224.    APL is a contractor of the United States.

225.    The 2022 Approval Order authorizes APL to engage in domestic trade between Saipan and other points in the United States if permitted by the U.S. Customs and Border Protection.

226.    APL has represented, through its communications with MARAD, that it intends to operate the DAKAR in domestic trade between Saipan and other points in the United States, including the West Coast.

227.    The transportation of domestic cargo to and from Saipan on the DAKAR constitutes the activities of the United States and its contractors.

228.    The transportation of domestic cargo to and from Saipan on the DAKAR is therefore coastwise trade within the meaning of the Northern Mariana Islands Covenant.

229.    The DAKAR is therefore ineligible for inclusion in the MSP, and the 2022 Approval Order approving the DAKAR for inclusion in the MSP and authorizing the DAKAR to engage in coastwise trade is arbitrary, capricious, and not in accordance with the law.

230.    In addition or in the alternative, MARAD failed to explain the basis for its assertion that the DAKAR may engage in domestic and coastwise trade otherwise prohibited by the MSA if permitted to do so by the U.S. Customs and Border Protection, and to address whether and to what extent the MSA prohibits such domestic and coastwise trade.

231.    The 2022 Approval Order provides no analysis as to whether the MSA permits the transportation of cargo between a State or Territory of the United States and the Northern Mariana Islands, even though Matson advised MARAD in its submission to the agency that the DAKAR could not permissibly operate in such trade.

232.    MARAD's failure to address an important aspect of the problem and/or to explain its reasoning such that the Court may meaningfully review the Order is arbitrary and capricious and contrary to law.

## PRAYER FOR RELIEF

WHEREFORE, Matson prays that this Court:

1.    Declare the 2022 Approval Order unlawful.

2.    Vacate and set aside the 2022 Approval Order.

3.    Enjoin MARAD from approving the DAKAR under the MSP, or from paying any subsidies to APL for operating the DAKAR.

4.    Declare that MARAD is permitting the DAKAR to sail, and paying subsidies, notwithstanding that the DAKAR is not in compliance with its MSP Operating Agreement.

5.    Award Matson its costs and reasonable attorneys' fees as appropriate.

6.    Grant such further relief as this Court deems proper.

Respectfully submitted,

Dated:   July 8, 2022

s/ *Lucas C. Townsend*

Lucas C. Townsend, DC Bar No. 1000024
LTownsend@gibsondunn.com
Joshua M. Wesneski, DC Bar No. 1500231
JWesneski@gibsondunn.com
Amalia Reiss, DC Bar No. 241775
AReiss@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500

Rachel S. Brass, *pro hac vice forthcoming*
RBrass@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105
(415) 393-8200

*Counsel for Plaintiff Matson Navigation Company, Inc.*