**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| MATSON NAVIGATION COMPANY, INC., <br><br> *Plaintiff*, <br><br> v. <br><br> U.S. DEPARTMENT OF TRANSPORTATION, *et al.*, <br><br> *Defendants*. | Civil Action No. 22-1975 (RDM) |

<u>**MEMORANDUM OPINION AND ORDER**</u>

This case is the latest in a series of disputes between Plaintiff Matson Navigation Company, Inc. ("Matson"), Defendant Maritime Administration ("MARAD"), and Intervenor-Defendant APL Maritime, Ltd. ("APL") regarding MARAD's approval of various APL-owned vessels for inclusion in Maritime Security Program ("MSP").  *See, e.g.*, *Matson Navigation Co. v. U.S. Dep't of Transp.*, 466 F. Supp. 3d 177 (D.D.C. 2020) ("*Matson II*"), *vacated in part as moot*, No. 20-5219, 2021 WL 3140374 (D.C. Cir. July 15, 2021); *Matson Navigation Co. v. U.S. Dep't of Transp.*, No. 21-cv-1606, 2022 WL 3139004 (D.D.C. Aug. 4, 2022) ("*Matson IV*"). Here, as before, Matson contends that a MARAD order approving inclusion of an APL vessel in the MSP fleet—this time, the CMA CGM DAKAR (the "DAKAR")—was unlawful.  According to Matson, the order is unlawful for two reasons: first, Matson argues that the DAKAR is not a "replacement vessel" within the meaning of the statute and thus may not engage in any form of domestic trade, and, second, it argues that the DAKAR engages in trade between the Northern

Mariana Islands and other portions of the United States and thus is not engaged exclusively in foreign trade or authorized mixed foreign and domestic trade within the meaning of the governing statute.  Dkt. 1 at 33, 36 (Compl. ¶¶ 198, 221).

Matson takes a different approach in this case than in its earlier challenges and, for the first time, seeks a preliminary injunction.  Dkt. 7.  Although aware of the high hurdle it faces in moving for that extraordinary relief, Matson says that it has no choice because, every time that it has achieved a legal victory over the past five years, "MARAD and APL have worked together to find an end run and [the agency has] reinstate[d] or replace[d] the challenged vessels so as to avoid meaningful judicial review."  Dkt. 26 at 9.  This pattern, Matson contends, has caused "irreparable harm to its business relationships and reputation."  *Id.*  Only a preliminary injunction, in Matson's view, can remedy the "unfair playing field in the U.S.-Guam/Saipan trade" created by MARAD's allegedly "unlawful . . . subsid[ization]" of APL's vessels.  *Id.* at 42.

Matson's experience over the past five years, however, has also taught it that the jurisdictional divide between this Court and the courts of appeals is perilous.  Matson brought its first set of challenges in the D.C. Circuit pursuant to the Hobbs Act, which vests the courts of appeals with "exclusive jurisdiction to enjoin, set aside, suspend, . . . or to determine the validity of . . . final orders of . . . the Secretary of Transportation issued pursuant to section 50501 . . . of title 46."  28 U.S.C. § 2342(3)(A).  At that time, Matson argued that the challenged orders fell within the scope of the Hobbs Act because they "involve[d] regulations and programs that are 'interrelated' with citizenship determinations in 46 U.S.C. § 50501."  *Matson Navigation Co. v. U.S. Dep't of Transp.*, 895 F.3d 799, 804 (D.C. Cir. 2018) ("*Matson I*") (some internal quotation marks omitted).  The D.C. Circuit, however, declined to adopt that sweeping view of its

jurisdiction, holding instead that "[a]bsent explicit reference or its functional equivalent . . . to a statute listed in the Hobbs Act," the courts of appeals lack original jurisdiction over challenges to MARAD orders.  *Id.* at 806.  In response, Matson changed course and, since then, has argued that the district courts—and not the courts of appeals—have exclusive jurisdiction over MARAD orders like the one at issue here, even when those orders make "explicit reference" to § 50501.

Following this path, Matson has continued to face rough waters, including two decisions from this Court declining to exercise jurisdiction over challenges to MARAD orders that made explicit reference to § 50501.  Now, hoping to avoid any further jurisdictional shoals, Matson has not only simultaneously filed suit in this Court and filed a petition for review in the D.C. Circuit, but it has also asked this Court and the court of appeals simultaneously to adjudicate parallel motions for preliminary relief.  *See* Pet'r's Mot. to Stay Order Pending Review and to Expedite Proceedings, *Matson Navigation Co. v. U.S. Dep't of Transp.*, No. 22-1150 (D.C. Cir. July 8, 2022) ("*Matson VII*").

For the reasons explained below (and explained in two prior opinions from this Court), the Court concludes that the D.C. Circuit—rather than this Court—has jurisdiction to consider Matson's current challenge.  That is enough to resolve Matson's motion for a preliminary injunction; without jurisdiction—or even a showing that it is "likely" that this Court has jurisdiction—the Court cannot enjoin MARAD from implementing its administrative order.  It makes little sense, moreover, for this Court to decide precisely the same dispute that is now pending before the D.C. Circuit.  Notwithstanding the Court's conclusion that it lacks jurisdiction, however, it will abstain from dismissing Matson's suit at this time and will, instead, hold the case in abeyance pending the D.C. Circuit's disposition of *Matson VII*.  If the D.C. Circuit agrees with this Court's jurisdictional analysis or concludes that the courts of appeals and

the district courts have concurrent jurisdiction, the Court will then dismiss this case, either for lack of jurisdiction or as duplicative.  But if the D.C. Circuit disagrees and concludes that the district courts are vested with exclusive jurisdiction over disputes like this one, the Court will permit Matson to renew its motion for a preliminary injunction.

## I.  BACKGROUND

### A.    Statutory Background

In the Maritime Security Act of 1996, Pub. L. No. 104-239, 110 Stat. 3118, Congress provided for the establishment by "[t]he Secretary of Transportation, in consultation with the Secretary of Defense" of "a fleet of active, commercially viable, militarily useful, privately owned vessels to meet national defense and other security requirements and maintain a United States presence in international commercial shipping."  46 U.S.C. § 53102(a).  This Maritime Security Fleet "consist[s] of privately owned, United States-documented vessels for which there are in effect operating agreements."  *Id.*  Pursuant to the Maritime Security Act, the Secretary established the Maritime Security Program ("MSP"), *see* 46 U.S.C. §§ 53101–53111, and delegated its administration to the Maritime Administrator, who heads MARAD, *see* 49 C.F.R. § 1.93(a).  To enroll their vessels in the program, contractors must enter into "operating agreements" with MARAD that cover vessels subject to the MSP.  *See* 46 U.S.C. § 53103(a); 46 C.F.R. § 296.2 (defining "MSP [o]perating [a]greement" as "the assistance agreement between a Contractor and MARAD that provides for MSP payments").  These agreements are, with limited exception, "effective only for 1 fiscal year" but are "renewable," 46 U.S.C. § 53104(a), and they obligate the Secretary to make fixed payments to the contractors for each vessel enrolled in the program, *id*. § 53106(a)(1)(A) (setting the annual payment for each vessel for fiscal years 2018, 2019, and 2020 at $5,000,000).

For a vessel to participate in the MSP, it must meet several eligibility requirements.  One such requirement is that the vessel must be "operated . . . in providing transportation in foreign commerce."  *Id.* § 53102(b).  Before the passage of the National Defense Authorization Act for Fiscal Year 2018 (the "2018 NDAA"), Pub. L. No. 115-91 (2017), 131 Stat. 1283 (codified in relevant part at 46 U.S.C. § 53105(a)(2)), another subsection of the statute, now 46 U.S.C. § 53105(a)(1), provided that "[a]n operating agreement under this chapter shall require that . . . the vessel . . . shall be operated exclusively in the foreign commerce or . . . in mixed foreign commerce and domestic trade allowed under a registry endorsement issued under [§] 12111 of [title 46]; and . . . shall not otherwise be operated in coastwise trade."  46 U.S.C. § 53105(a)(1).  A registry endorsement under § 12111(b), in turn, authorizes vessels to engage in trade with Guam, American Samoa, Wake, Midway, or Kingman Reef, all of which are unincorporated territories of the United States.  The 2018 NDAA, however, amended that section to restrict the extent to which new vessels may operate in trade between the United States and its territories. *Id.* § 53105(a)(2).  Under the current version of the law, a vessel "first covered by an [MSP] operating agreement after the date of the enactment of the National Defense Authorization Act for Fiscal Year 2018" may not "operate[] in the transportation of cargo between points in the United States and its territories" unless the vessel is a "replacement vessel" under § 53105(f), *id.*—that is, unless it replaces an existing vessel already subject to an operating agreement, *id.* § 53105(f).

Vessels in the MSP must also meet certain ownership and operator requirements detailed in 46 U.S.C. § 53102(c).  *Id.* § 53102(b)(1).  Most relevant here is paragraph (2)(A) of § 53102(c), which requires that a vessel be "owned by a person that is a citizen of the United States under section 50501 of this title or that is a United States citizen trust," *id.*

§ 53102(c)(2)(A)(i), and demise chartered to a "documentation citizen"—*i.e.*, one who, among other things, is eligible to document the vessel under 46 U.S.C. §§ 12101-12152, *id.* § 53102(c)(2)(A)(ii)(I).  Section 50501, in turn, provides that "a corporation, partnership, or association is deemed to be a citizen of the United States only if the controlling interest is owned by citizens of the United States," with the caveat that, "if the corporation, partnership, or association is operating a vessel in the coastwise trade, at least 75 percent of the interest must be owned by citizens of the United States."  *Id.* § 50501(a).  The statute separately defines a "United States Citizen Trust" as a trust in which "each of the trustees is a citizen of the United States," and each trustee attests that no beneficiary or other person who is not a citizen of the United States "hold[s] more than 25 percent of the aggregate power to influence or limit the exercise of the authority of the trustee with respect to matters involving any ownership or operation of the vessel that may adversely affect the interests of the United States."  *Id.* § 53101(11)(B).

As already adverted to, the statute also provides a mechanism for replacing vessels subject to MSP agreements with new vessels.  Under 46 U.S.C. § 53105(f), "[a] contractor may replace a vessel under an operating agreement with another vessel that is eligible to be included in the Fleet under section 53102(b), if the Secretary, in conjunction with the Secretary of Defense, approves the replacement of the vessel."  And § 53102(b), as discussed above, sets forth numerous requirements for vessels to be eligible to join the MSP, including requirements related to ownership and operation in foreign commerce.  After passage of the 2018 NDAA, however, the only newly enrolled vessels that are eligible to transport cargo between the United States and its territories are replacement vessels taking the place of existing vessels in the program.  *Id.* § 53105(a)(2).

B.     **Factual Background**

The ever-evolving story of the conflict between Matson, MARAD, and APL is recounted

here in some detail to facilitate both an understanding of Matson's substantive claims and the

basis for this Court's denial of Matson's preliminary injunction motion.

1.     *Initial APL GUAM and APL SAIPAN proceedings (*Matson I *and* Matson II*).*

In January 2005, the Secretary of Transportation entered into nine agreements with APL,

permitting nine APL vessels to operate as part of the MSP.  *See Matson II*, 466 F. Supp. 3d at

183.  Approximately a decade later, APL applied to MARAD for authorization to replace two of

those vessels.  *Id.*  MARAD obliged, approving APL's application to replace the APL CYPRINE

with the APL GUAM in October 2015 (the "2015 Approval Order"), Dkt. 1 at 14 (Compl. ¶ 69),

and approving APL's application to replace the APL AGATE with the APL SAIPAN in

December 2016 (the "2016 Approval Order"), *id.* at 15 (Compl. ¶ 78).

Matson provides ocean freight carrier services in the Pacific region and serves several of

the same routes as does APL.  *Id.* at 5–6 (Compl. ¶¶ 22, 25).  Shortly after MARAD's approval

of the replacement vessels, Matson filed an administrative protest with MARAD in which it

challenged the vessels' eligibility for the MSP.  *Matson I*, 895 F.3d at 802–03.  MARAD rejected

Matson's appeal, concluding that Matson lacked standing to appeal the 2015 and 2016 Approval

Orders and that APL's vessels met the relevant statutory criteria.  *Id.* at 803.  Matson then sought

review of MARAD's approval orders in the D.C. Circuit.  *Id.*

The D.C. Circuit dismissed Matson's petitions for lack of jurisdiction.  *Id.* at 806.  With

respect to Matson's challenge to MARAD's 2015 Approval Order, the court of appeals held that

it lacked jurisdiction because Matson failed to file a timely petition for review.  *Id.* at 804–05.

And with respect to the 2016 Approval Order, the court held that it lacked jurisdiction because

MARAD's order "did not make an explicit finding" or the "functional equivalent" of an explicit finding "that the entities involved were U.S. citizens within the meaning of [46 U.S.C. §] 50501," and thus the order was not made "pursuant to" § 50501—a criterion that the court deemed necessary for it to exercise jurisdiction over Matson's challenge under the Administrative Orders Review Act (also known as the "Hobbs Act"), 28 U.S.C. § 2342(3)(A). *Id.* at 806.

Following the D.C. Circuit's dismissal, Matson challenged the approval orders in this Court. *See Matson II*, 466 F. Supp. 3d at 185. APL intervened, and the parties cross-moved for summary judgment. *Id.* at 180. At the same time, MARAD also moved to dismiss Matson's challenge to the 2015 Approval Order, arguing that because that order was made, in part, "pursuant to" 46 U.S.C. § 50501, the Hobbs Act vested the courts of appeals with exclusive jurisdiction to review it. *Id.* at 180–81.

This Court agreed with MARAD's jurisdictional argument and granted MARAD's motion to dismiss Matson's challenge to the 2015 Approval Order. *Id.* at 181. The Court concluded that because the 2015 Approval Order made "explicit reference" to § 50501, the order was made "pursuant to" that section and thus triggered the court of appeals' Hobbs Act jurisdiction over the entire order. *Id.* at 188–89. Applying the test articulated by the Second Circuit in *Sutton v. United States Department of Transportation*, 38 F.3d 621 (2d Cir. 1994), the Court determined that, "[b]ecause MARAD's citizenship determination under § 50501 was 'a necessary predicate to' the challenged determination that the APL Guam was eligible to participate in the MSP as a replacement vessel, the courts of appeals have exclusive jurisdiction to review the entire determination." *Matson II*, 466 F. Supp. 3d at 191 (quoting *Sutton*, 38 F.3d at 625).

The Court then considered "whether the district courts have concurrent jurisdiction to review those portions of a multiple-authority agency order that turn on statutory provisions not listed in the Hobbs Act," *id.* at 190, and determined that the answer was no, *id.* at 192.  The Court observed that although the "D.C. Circuit has not expressly answered the question[,] . . . [s]everal D.C. Circuit decisions, . . . along with out-of-circuit precedents, support the conclusion that the courts of appeals have exclusive jurisdiction to review multiple-authority orders."  *Id.* at 190; *see also id.* at 190–91 (collecting cases).  The Court also found instructive the plain text of the Hobbs Act itself, which "grants the courts of appeals *exclusive* jurisdiction over the entirety of '*final orders*' and not merely those portions of final orders that implicate § 50501."  *Id.* (internal quotation marks omitted) (emphasis added) (quoting 28 U.S.C. § 2342(3)(A)).  Based on these considerations, the Court held that "it lack[ed] jurisdiction to consider Matson's challenge to MARAD's 2015 Approval Order authorizing the substitution of the APL Guam for the existing MSP vessel."  *Id.* at 192.

There was no similar jurisdictional barrier to this Court's review of the 2016 Approval Order, however (recall that it made no reference to § 50501), so the Court reached the merits of that portion of Matson's challenge.  *Id.*  The question was whether the APL SAIPAN was eligible to replace the AGATE under the MSP's foreign commerce requirements.  Those requirements obligate vessels in the MSP to operate "in providing transportation in foreign commerce."  46 U.S.C. § 53102(b)(2).  They also provide that vessels in the program "shall be operated exclusively in the foreign commerce or . . . in mixed foreign commerce and domestic trade allowed under a registry endorsement issued under [46 U.S.C. § 12111]"—that is to say, foreign commerce or mixed foreign commerce and domestic trade with Guam, American Samoa,

Wake, Midway, or Kingman Reef.  *Id.* § 53105(a)(1)(A).[1]  But the APL SAIPAN (perhaps

unsurprisingly) also served Saipan, part of the Commonwealth of the Northern Mariana Islands,

a territory of the United States.  *Matson II*, 466 F. Supp. 3d at 184.  The nub of the issue in

*Matson II* was thus whether MARAD had lawfully approved the APL SAIPAN, given that the

vessel operated in domestic trade (arguably) beyond the scope of a registry endorsement.  On

that score, the Court concluded that because MARAD "did not address whether its Approval

Order can be squared with the APL Saipan's trade with Saipan," *id.* at 197, and therefore

"entirely failed to consider an important aspect of the question before it," the 2016 Approval

Order could not be sustained, *id.* at 181.  The Court, accordingly, remanded the matter to

MARAD and subsequently vacated MARAD's approval of the APL SAIPAN.  *Id.*; Dkt. 1 at 19

(Compl. ¶ 99).

      2.    *Subsequent APL SAIPAN proceedings (*Matson III*).*

      On remand, MARAD re-approved the APL SAIPAN as the replacement for the AGATE

(the "2020 Approval Order").  Dkt. 1 at 20 (Compl. ¶ 107).  In the agency's view, the APL

SAIPAN's Saipan service was permissible with a registry endorsement.  *Id.* (Compl. ¶ 108).

MARAD also determined that the APL SAIPAN was not too old for inclusion in the MSP under

46 U.S.C. § 53102(b)(3)(B), which limits eligibility to vessels that are "15 years of age or less on

the date [they] are included in the Fleet."  MARAD reached this conclusion notwithstanding the

fact that the APL SAIPAN was more than fifteen years old at the time the 2020 Approval Order

was issued, considering it more relevant that the vessel met the age requirement when it first

entered the fleet.  Dkt. 1 at 20 (Compl. ¶ 109).

---

[1] The NDAA's changes to § 53105(a) were not relevant in *Matson II*, because neither the APL
GUAM nor the APL SAIPAN was "first covered by an operating agreement after the date of the"
2018 NDAA.  46 U.S.C. § 53105(a)(2).

Matson challenged the 2020 Approval Order in this Court.  *Matson Navigation Co. v. U.S. Dep't of Transp.*, 20-cv-2779 (D.D.C. 2020) ("*Matson III*").  In April 2021, however, MARAD moved for a voluntary remand, acknowledging that, contrary to its determination in the 2020 Approval Order, the APL SAIPAN was ineligible to be included in the MSP fleet because of its age.  Dkt. 1 at 23 (Compl. ¶¶ 127–28).  After oral argument, the Court granted MARAD's motion and remanded without vacatur, retaining jurisdiction over the case and ordering MARAD to take further action within 60 days.  *Id.* at 24 (Compl. ¶¶ 134–36).  On remand once again, MARAD reconsidered whether to re-approve the APL SAIPAN a second time, but it ultimately declined to do so.  *Id.* at 25 (Compl. ¶¶ 141, 144).  Instead, the agency informed Matson that it intended to consider a new vessel to replace the APL SAIPAN, itself a replacement for the AGATE.  *See id.* (Compl. ¶ 144).

3.    *APL HERODOTE proceedings (*Matson IV *and* Matson V*).*

In the meantime, MARAD approved the HERODOTE as a replacement vessel for the APL GUAM (the "2021 Approval Order").  *Id.* at 22 (Compl.  ¶ 118).  "Among other things," the 2021 Approval Order "expressly found that 'the Herodote will be owned by . . . a Delaware corporation and United States citizen corporation within the meaning of 46 U.S.C. § 50501.'" *Matson IV*, 2022 WL 3139004, at *3.  After the HERODOTE's approval, the D.C. Circuit dismissed the *Matson II* appeal as moot and, accordingly, vacated the portion of this Court's opinion that concerned its subject-matter jurisdiction (or lack thereof) to review the 2015 Approval Order.  *Matson Navigation Co. v. U.S. Dep't of Transp.*, 2021 WL 3140374, at *1. Then, in June 2022, Matson challenged the 2021 Approval Order, both in this Court, *Matson IV*, 2022 WL 3139004, at *3, and in the D.C. Circuit, *Matson Navigation Co. v. U.S. Dep't of Transp.*, No. 21-1137 (D.C. Cir. 2021) ("*Matson V*").  The D.C. Circuit held *Matson V* in

abeyance pending this Court's decision in *Matson IV*.  Order, *Matson V*, No. 21-1137 (D.C. Cir. July 9, 2022).

On August 4, 2022, this Court dismissed Matson's challenge to the 2021 Approval Order for lack of subject-matter jurisdiction, relying on the same reasoning it articulated in *Matson II* with respect to the 2015 Approval Order.  *Matson IV*, 2022 WL 3139004, at *1.  As explained, *Matson II* reasoned that, because MARAD explicitly invoked § 50501 in the 2015 Approval Order, the order was issued "pursuant to" § 50501.  466 F. Supp. 3d at 189–90.  The Hobbs Act therefore vested exclusive jurisdiction to review the order in the court of appeals.  *Id.* at 192.  In reaching this conclusion in *Matson II*, the Court noted that the D.C. Circuit's decision in *Matson I* "strongly implied" that MARAD's invocation of § 50501 in an administrative order was sufficient to trigger the Hobbs Act; indeed, the court of appeals drew just this line in distinguishing between (1) the 2015 Approval Order, which expressly referenced § 50501 and review of which "could" have been proper in the court of appeals had Matson filed a timely petition for review, and (2) the 2016 Approval Order, which did not reference § 50501 and review of which was therefore improper in the court of appeals.  *Matson IV*, 2022 WL 3139004, at *4 (citing *Matson I*, 895 F.3d at 804–05).  *Matson II* further concluded that the court of appeals' Hobbs Act jurisdiction over a "multiple-authority order" like the 2015 Approval Order was exclusive.  *Matson II*, 466 F. Supp. 3d at 189–90.  Even though *Matson II* had been vacated as moot, all of this reasoning applied with full force to the 2021 Approval Order, which also expressly invoked § 50501 and therefore "for jurisdictional purposes . . . [wa]s indistinguishable from the 2015 Approval Order."  *Matson IV*, 2022 WL 3139004, at *3.

In deciding *Matson IV*, the Court considered and rejected Matson's several arguments to the contrary.  First, Matson argued, as it had in *Matson II*, that the Supreme Court's opinion in

*National Association of Manufacturers v. Department of Defense*, 138 S. Ct. 617, 630 (2018) ("*NAM*"), defined "pursuant to" to mean "by reason of the authority of," "direct[ed] [by]," or "authorize[d] [by]." *Matson IV*, 2022 WL 3139004, at *5. And, according to Matson, because § 50501 did not direct, authorize, or confer on the Secretary the authority to issue the 2021 Approval Order, the order was not issued "pursuant to" § 50501. *Id.* The Court explained, however, that this argument was no more convincing than it had been in *Matson II*. Most significantly, adopting Matson's preferred definition of "pursuant to" would have rendered the Hobbs Act's vesting of exclusive appellate jurisdiction in cases challenging agency decisions made "pursuant to" § 50501 meaningless, because § 50501 does not direct, authorize, or confer authority to do *anything*. *Id.* at *6. Rather, it "merely sets forth the requirements for being 'deemed to be' a 'citizen of the United States' for purposes of the merchant marines." *Id.* at *5 (quoting *Matson II*, 466 F. Supp. 3d at 189). Nor could Matson identify any reading of § 50501 that might avoid this difficulty; none of the MARAD regulations that Matson proffered as examples of actions taken "pursuant to" § 50501 relied on any authority found in that statutory provision to "direct" "authorize," or "approve[]" anything. *Id.* at *6. Finally, Matson urged the Court to discard the distinction it had drawn in *Matson II* "between orders that *explicitly* invoke § 50501 and orders that *implicitly* invoke § 50501." *Id.* But it was not this Court that drew that distinction; rather, the court of appeals did so in *Matson I*, and this Court merely applied the D.C. Circuit's reasoning. *Id.*

        4.    *APL DAKAR proceedings (*Matson VI *and* Matson VII*).*

        After the approval of the HERODOTE (but before the Court's resolution of Matson's challenge to that approval), APL and MARAD returned to the matter of replacing the AGATE— the vessel APL had tried unsuccessfully to replace with the APL SAIPAN. Dkt. 1 at 26–27

(Compl. ¶¶ 151, 154).  In June 2021, APL proposed to replace the AGATE with the DAKAR, and approximately a year later MARAD approved APL's request (the "2022 Approval Order"). *Id.* The 2022 Approval Order finds that "the proposed vessel ownership and operational structure for the DAKAR as detailed in Appendix A, attached, meets the citizenship requirements for owners, charterers, and operators of Fleet vessels under 46 U.S.C. § 53102(c)(2)."  Dkt. 1-39 at 2.  Appendix A, in turn, states that: (1) the beneficial owner of the DAKAR is a documentation citizen; (2) the DAKAR is held in trust; (3) the trustee is a "50501 Citizen;" and (4) the disponent owner is APL.  Dkt. 1-40 at 2.  Appendix A also explains that a "50501 Citizen" is "a person, partnership, trust, or corporation meeting the definition of the United States citizen under 46 U.S.C. § 50501" and provides additional detail, drawn from § 50501, about what ownership requirements are necessary for a corporation to satisfy that section. *Id.*

## C.    Procedural Background

On July 8, 2022, Matson initiated this action challenging MARAD's approval of the DAKAR, naming the Department of Transportation and MARAD (collectively, "MARAD") as defendants.  Dkt. 1 (Compl.).  Three days later, APL filed an unopposed motion to intervene as a defendant, Dkt. 14, which the Court granted, Min. Order (July 13, 2022).

In its complaint, Matson alleges that MARAD's approval of the DAKAR was arbitrary, capricious, and otherwise contrary to law for two reasons.  Dkt. 1 at 34, 38 (Compl. ¶¶ 205, 232). First, according to Matson, the 2022 Approval Order authorizes the DAKAR to "engage in impermissible domestic trade in violation of 46 U.S.C. § 53105(a)(2)," because the vessel operates "in the transportation of cargo between points in the United States and its territories," but it is not a "replacement vessel."  Dkt. 1 at 33–34 (Compl. ¶¶ 191, 196, 200).  This is

unlawful, says Matson, because the DAKAR was first "covered by an operating agreement" after the 2018 NDAA was passed on December 17, 2017, and § 53105(a)(2) does not permit vessels admitted after that date to transport cargo between the United States and its territories unless such vessels are "replacement vessel[s] under [§ 53105(f)]." *Id.* at 33 (Compl. ¶¶ 193–96). And the DAKAR cannot be considered a replacement vessel, Matson further alleges, because the vessel it purports to replace, the AGATE, has not operated since 2016 and, thus, was not a "vessel" in the relevant sense at the time the DAKAR was approved. *Id.* (Compl. ¶¶ 197, 198). Second, Matson alleges that the 2022 Approval Order is unlawful because the DAKAR "will operate in impermissible domestic and coastwise trade" in violation of, among other things, 46 U.S.C. §§ 53102(b) and 53105(a) by "provid[ing] transportation . . . between the rest of the United States and Saipan." *Id.* at 34 (Compl. ¶¶ 207–09, 214). Matson, accordingly, asks the Court to declare the 2022 approval of the DAKAR unlawful and to vacate and set aside MARAD's order. *Id.* at 38.

On the same day that it filed suit, Matson moved for a preliminary injunction enjoining MARAD from taking any action pursuant to the 2022 Approval Order and from paying any subsidies to APL pursuant to the operating agreement covering the DAKAR. Dkt. 7 at 1. Matson contends that it is likely to succeed on the merits of its challenges to the 2022 Approval Order and that it will suffer irreparable harm absent a preliminary injunction in two respects: first, MSP subsidies for the DAKAR unfairly enable APL to lower its prices beyond the point at which Matson can compete, and second, MARAD's approval of the DAKAR has caused "uncertainty and turmoil" in Matson's business operations and has irreparably damaged its relationships and reputation by allowing APL to "hold itself out as a carrier more focused on the

needs of the U.S. citizens in Guam and Saipan." Dkt. 26 at 43–44. Matson also argues that a preliminary injunction will not harm MARAD and would serve the public interest. *Id.* at 44.

At the same time that Matson filed this lawsuit and its motion for a preliminary injunction, it filed a Hobbs Act petition in the D.C. Circuit and moved for a stay of the 2022 Approval Order. Pet'r's Mot. to Stay Order Pending Review and to Expedite Proceedings, *Matson VII*, No. 22-1150 (D.C. Cir. July 8, 2022). That motion is now fully briefed and awaiting resolution by the D.C. Circuit. *Matson VII*, No. 22-1150.

## II. ANALYSIS

A preliminary injunction is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To prevail on a motion for a preliminary injunction, "[t]he movant must: (1) establish a likelihood of 'succe[ss] on the merits'; (2) show 'irreparable harm in the absence of preliminary relief'; (3) demonstrate that the equities favor issuing an injunction; and (4) persuade the court that 'an injunction is in the public interest.'" *Trump v. Thompson*, 20 F.4th 10, 31 (D.C. Cir. 2021) (alterations in original) (quoting *Winter*, 555 U.S. at 20). Before the Supreme Court's decision in *Winter*, courts in this circuit applied a "sliding-scale" approach under which "a strong showing on one factor could make up for a weaker showing on another." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). Since *Winter*, however, the D.C. Circuit has hinted on several occasions that *Winter* "should be read to abandon the sliding-scale analysis in favor of a 'more demanding burden' requiring plaintiffs to independently demonstrate both a likelihood of success on the merits and irreparable harm," *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 205 F. Supp. 3d 4, 26 (D.D.C. 2016) (quoting *Sherley*, 644 F.3d at 392–93), but it "has not yet needed to decide th[e] issue," *League of Women Voters of United States v.*

16

*Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016).  For the reasons explained below, this case once again fails squarely to present the question whether the sliding-scale approach survived *Winter*.

Years after *Winter* was decided, the D.C. Circuit declared in unequivocal terms that a party seeking a preliminary injunction must establish a substantial likelihood that the Court has subject-matter jurisdiction.  *See Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015); *see also Obama v. Klayman*, 800 F.3d 559, 565 (D.C. Cir. 2015) (Williams, J.); *A.M.P.V. ex. rel. Aguayo v. Barr*, No. 20-cv-913, 2020 WL 2079433, at *4 (D.D.C. Apr. 30, 2020) ("[T]he D.C. Circuit has held, without qualification, that 'a party who seeks a preliminary in[j]unction must show a substantial likelihood' that the Court has jurisdiction." (quoting *Food & Water Watch*, 808 F.3d at 913)); *Calif. Ass'n of Private Postsecondary Schools v. DeVos*, 344 F. Supp. 3d 158, 167 (D.D.C. 2018) (noting that "regardless of whether the sliding scale approach applies, parties seeking a preliminary injunction must" establish a likelihood that all "jurisdictional prerequisites" are satisfied).  That rule makes eminent sense because the power of the federal courts to act is derived from Article III of the Constitution and any jurisdiction-conferring statutes, *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93–95 (1998), and courts must, accordingly, proceed with caution when their jurisdiction is in doubt.

Here, Matson has not come close to meeting its threshold burden of establishing a substantial likelihood that this Court has jurisdiction to enjoin MARAD from implementing the challenged order.  As Matson knows better than most, this Court has twice confronted and decided precisely the same jurisdictional question posed in this case, and on both occasions the Court concluded that the Hobbs Act vests the courts of appeals with exclusive jurisdiction over challenges to MARAD orders that, like the order at issue here, expressly invoke § 50501 in approving the inclusion of a new vessel in the MSP fleet.  *See Matson II*, 466 F. Supp. 3d at 190–

91; *Matson IV*, 2022 WL 3139004, at *4.  Those decisions represent more than preliminary assessments of whether it is likely (or not) that this Court has jurisdiction over a challenge of the type presented here; they represent fully considered, final jurisdictional dispositions.  To be sure, Matson might ultimately convince the Court that it erred in those prior decisions—particularly, if the court of appeals provides any new or different guidance on the issue—but, in its moving papers, Matson offers no argument that this Court has not previously considered and rejected. Under these circumstances, Matson's motion fails at the outset.

The Court has little to add to what it has already said twice before.  The Hobbs Act confers exclusive jurisdiction on the courts of appeals to review "all rules, regulations, or final orders of . . . the Secretary of Transportation issued *pursuant to section 50501* . . . of title 46." 28 U.S.C. § 2342(3)(A).  Relying in part on the D.C. Circuit's opinion in *Matson I*, this Court in *Matson II* and *Matson IV* concluded that if an order of the Secretary "explicit[ly] reference[s]" § 50501 in an order, that "is enough to trigger Hobbs Act jurisdiction over the entire order." *Matson IV*, 2022 WL 3139004, at *4.  By explicitly referencing § 50501, an order makes clear that the Secretary considered the citizenship question and predicated his decision, at least in part, on an application of § 50501.

Here, the 2022 Approval Order explicitly references § 50501 and was therefore issued pursuant to it.  To be sure, this case differs from *Matson I*, *Matson II*, and *Matson IV* in one respect: in each of those cases, the body of the order at issue included an explicit reference to § 50501, while, in this case, MARAD referenced § 50501 in an appendix to the order.  *See* Dkt. 1-40 at 2.  But, as Matson itself concedes, this "distinction ultimately is immaterial, because courts routinely consider appendices as part of the order on review when evaluating agency action."  Dkt. 26 at 24 (citing *Glaser v. FCC*, 20 F.3d 1184, 1186 (D.C. Cir. 1994); *Indian River*

*County v. Dep't of Transp.*, 348 F. Supp. 3d 17, 62 (D.D.C. 2018)).  That concession is well taken, since MARAD explained in the main body of the 2022 Approval Order that it "[f]ound that the proposed vessel ownership and operational structure for the DAKAR, *as detailed in Appendix A*, *attached*," satisfied the statutory requirements.  Dkt. 1-39 at 2 (emphasis added).  As such, MARAD made the appendix an integral part of its order.

Wisely, Matson also declines to take issue with whether MARAD correctly invoked § 50501.  Although the 2022 Approval Order contains little explanation regarding MARAD's determination that the trustee of the trust that owns the vessel, acting as "Owner Trustee," qualifies as a § 50501 citizen or why that matters, the agency's § 50501 determination constituted a necessary predicate to the order approving the DAKAR as a replacement vessel. Dkt. 1-40 at 2.  (Under the relevant provision of the statute, the fact that the order found that the "beneficial owner" and "disponent owner" were "documentation citizens" was insufficient, standing alone, to satisfy the requirements of 46 U.S.C. §§ 53101(11), 53102(c)).  Indeed, any dispute regarding the proper application or interpretation of § 50501 would only reinforce the Court's conclusion that the Hobbs Act vests exclusive jurisdiction in the courts of appeals.  But, at the same time, the fact that Matson declines to dispute MARAD's application or interpretation of § 50501 does not divest the courts of appeals of jurisdiction.  Under the Hobbs Act, all that matters is that the order was "issued pursuant to section 50501."  28 U.S.C. § 2342(3)(A).  That is, jurisdiction turns on the nature of the order and not on the nature of the petitioner's challenge to that order.

The arguments that Matson does press mirror those raised and rejected in *Matson II* and *Matson IV*.  Matson's basic pitch is that, under *NAM*, the 2022 Approval Order could not have been issued "pursuant to" § 50501 because § 53105(f), not § 50501, confers on the Secretary the

authority to approve replacement vessels.  Dkt. 26 at 24–27.  But this argument overreads *NAM*
and is at odds with how the D.C. Circuit interpreted *NAM* in *Matson I*.  *NAM* involved "a
discrete issue of statutory interpretation," 138 S. Ct. at 624, namely: whether an EPA rule
defining a particular statutory phrase from the Clean Water Act constituted an "action" taken by
the EPA Administrator "in approving or promulgating any effluent limitation or other limitation
*under* [33 U.S.C. § 1311]," *id.* at 628 (emphasis added) (quoting 33 U.S.C. § 1369(b)(1)(E)).
Holding that it did not, the Supreme Court explained that "the statutory context makes clear that
the prepositional phrase—'under section 1311'—is most naturally read to mean" that the
limitation at issue "must be approved or promulgated 'pursuant to' or 'by reason of the authority
of' § 1311."  *Id.* at 630.  Because § 1311 does not "direct or authorize the EPA to *define* a
statutory phrase appearing elsewhere in the Act," the Court concluded that the definitional rule at
issue had not been "promulgate[d] or approve[d] *under*" that provision.  *Id.* (second emphasis
added).  Thus, although the Court held that the word "under" was best construed—in context—to
mean "'pursuant to' or 'by reason of the authority of,'" it did not say that the phrase "pursuant
to" always—or even typically—means "by reason of the authority of."  *Id.*  The bottom line is
that, although *NAM* concluded that "pursuant to" can, at times, mean "by reason of the authority
of," the meaning of the phrase is not set in stone and, instead, turns on context.

    This understanding of *NAM* is entirely consistent with the D.C. Circuit's discussion of
*NAM* in *Matson I* and with the court's analysis of the question presented here—that is, when an
administrative order is issued "pursuant to" 46 U.S.C. § 50501.  The court in *Matson I* began its
analysis by observing that *NAM* was "instructive" and that in construing a provision of the Clean
Water Act, the *NAM* Court "concluded that, *viewed in context*, the word 'under' in [the phrase]
'under section 1311' is 'most naturally read to mean that the effluent limitation or other

limitation must be approved or promulgated "pursuant to" or "by reason of the authority of" § 1311.'" 895 F.3d at 804 (emphasis added) (quoting *NAM*, 138 S. Ct. at 630). Or, in other words, understood in this context, "the provision *pursuant to* which an agency acts is the statute that 'direct[s] or authorize[s]' the agency to take the relevant action." *Id.* (emphasis added) (quoting *NAM*, 138 S. Ct. at 630). The court then recognized that 46 U.S.C. § 53105(f) is the statutory provision that "empowers MARAD . . . to approve a vessel as a replacement" and that MARAD, therefore, likely acted "pursuant to" § 53105(f) in approving the vessels at issue. *Id.* And, as the court of appeals further observed, § 50501, in contrast, "does not 'authorize' MARAD to act on a contractor's request for approval of a replacement vessel." *Id.*

Had *Matson I*'s analysis ended there, the Court might well agree with Matson that MARAD orders approving replacement vessels cannot be issued "pursuant to § 50501." But the D.C. Circuit went on to explain that § 53105(f) permits the Secretary to approve replacement vessels only if they satisfy the requirements of § 53102(b), which "does not always"—but sometimes does—"require contractors to fit the definition of a U.S. citizen in section 50501." *Id.* The "relevant consideration" for Hobbs Act purposes was therefore whether an order issued pursuant to § 53105(f) was "*also* issued pursuant to § 50501." *Id.* (emphasis added). And, although the court of appeals did not further elaborate what it meant by this with respect to the first of the two orders at issue (because Matson's petition was untimely), *id.*, in addressing the second order it provided important guidance, *id.* at 805–06. As the court explained, it lacked Hobbs Act jurisdiction to consider Matson's challenge to that order because "MARAD never explicitly invoked section 50501 in reaching its eligibility determination" and because it was not "apparent from [MARAD's] decision that it was addressing U.S. citizenship within the meaning of section 50501." *Id.* at 805. And, as the court of appeals further observed, "[a]bsent explicit

reference" to § 50501 or the "functional equivalent" of an explicit reference, it remained possible that MARAD approved the vessel on grounds unmoored to § 50501. *Id.*

Considered in this light, *Matson I* is best understood as follows: when MARAD "explicitly" invokes § 50501 in approving an MSP replacement vessel, the agency acts pursuant to both § 53105(f) *and* § 50501. To be sure, in those circumstances, § 50501 does not provide the direct, affirmative authority for the Secretary to accept the replacement vessel into the program. It does, however, provide an essential predicate or ingredient for the Secretary's action, and that predicate is "explicitly" made part of the order that is subject to review. "Background principles relied on by the agency in making a final determination" might not suffice, but where "there is [an] indication that the . . . [o]rder was issued pursuant to section 50501 or [any] other statute listed in the Hobbs Act," the court of appeals has jurisdiction to review the order. 895 F.3d at 806. Thus, far from presenting an obstacle to this Court's reading of "pursuant to section 50501," *Matson I* anchors it.

This reading of "pursuant to section 50501" also reconciles the ordinary meaning of "pursuant to" with its function in the Hobbs Act, something Matson's more restrictive position cannot do. As this Court has previously observed, *Matson II*, 466 F. Supp. 3d at 189–90, the definition of "pursuant to" includes "in conformity with," *Pursuant To*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/pursuantto (last visited Aug. 19, 2022); *see also Webster's Third New International Dictionary* 1848 (3d ed. 1993) (defining "pursuant to" to mean "in the course of carrying out: in conformance to or agreement with: according to"), or "in compliance with," *Pursuant To*, *Black's Law Dictionary* (10th ed. 2014). When a tenant pays $100 in rent "pursuant to" a lease, for example, she pays that $100 in compliance with the lease, but not, as Matson would posit, by reason of some authority granted to the tenant under the lease.

*See Webster's Third New International Dictionary*, *supra*, at 1848 ("acted *pursuant to* their

agreement" (emphasis in original)).  The same is true under the Hobbs Act: when the Secretary

issues an order approving a replacement vessel that is explicitly premised on a finding of U.S.

citizenship under § 50501, she issues the order pursuant to both § 53105(f) *and* § 50501.

   *NAM* itself explained that the meaning of certain indeterminate terms—there "under,"

here "pursuant to"—must be drawn from their statutory context.  138 S. Ct. at 630.  In *NAM*, a

contextual approach led the Court to conclude that an "action" is taken by the EPA

Administrator "under" § 1311 if the "action" is taken "'by reason of the authority of' § 1311."

*Id.*  But that logic does not carry over to the Hobbs Act, which turns on whether an "order" was

"issued pursuant to section 50501."  28 U.S.C. § 2342(3)(A).  Understood in the context of the

Hobbs Act, the definition of "pursuant to" that Matson proposes—which requires an affirmative

grant of authority or a direction to act—cannot be reconciled with the statutory text.  As the

Court has previously explained:

> The Hobbs Act provides for exclusive appellate jurisdiction in cases challenging
> agency decisions made "pursuant to [§] 50501."  28 U.S.C. § 2342(3)(A). To
> give that statutory text meaning, as the Court must, *see Mac's Shell Serv., Inc.
> v. Shell Oil Prods. Co*., 559 U.S. 175, 188 (2010), there must exist some agency
> decisions that are made "pursuant to" § 50501, which—as Matson observes—
> merely sets forth the requirements for being "deemed to be" a "citizen of the
> United States" for purposes of the merchant marines.  46 U.S.C. § 50501.  As a
> result, the Hobbs Act's reference to rules or orders issued "pursuant to § 50501"
> can have meaning only if agency action taken "pursuant to § 50501" includes
> rules or orders that do not "direct," "authorize," or "approve[ ]" some action that
> is compelled or authorized by § 50501 itself.

*Matson IV*, 2022 WL 3139004, at *5 (quoting *Matson II*, 466 F. Supp. 3d at 189).  Although

Matson alludes to prior efforts to identify examples of regulations issued by MARAD that were

authorized or issued by reason of an authority granted to the Secretary in § 50501, Dkt. 25 at 11,

as the Court has previously explained, those efforts are futile, *Matson IV*, 2022 WL 3139004, at

*6.  The insurmountable problem is that § 50501 does not "direct, authorize, or approve *any* action by the Secretary of Transportation; all it does is state the requirements necessary for a vessel owner to be deemed a citizen of the United States, *see* 46 U.S.C. § 50501(a), which, at least at times, is necessary for the vessel to qualify for inclusion in the MSP, *id.* § 53102(c)." *Matson IV*, 2022 WL 3139004, at *6.

Matson further contends that the 2022 Approval Order could not have been issued "pursuant to" § 50501 because, if it had been, then, contrary to the D.C. Circuit's holding in *Matson I*, the 2016 Approval Order would also have been issued "pursuant to" § 50501.   Dkt. 25 at 11–12.  This is because "in the 2016 Approval Order, MARAD was required to make the exact same determination of citizenship it did under the 2022 Approval Order." *Id.* at 11. Matson, however, overlooks a key distinction between the two orders.  In *Matson I*, the D.C. Circuit found it significant for jurisdictional purposes that "MARAD did not make an explicit finding [in the 2016 Approval Order] that the entities involved were U.S. citizens within the meaning of section 50501."  895 F.3d at 806.  Here, by contrast, Appendix A of the 2022 Approval Order makes just such a finding with respect to the trustee of the U.S. citizen trust that owns the DAKAR.  Dkt. 1-40 at 2.  Anticipating this difficulty, Matson recapitulates its objection to the distinction between an agency "explicit[ly]" and "implicit[ly]" relying on a statutory provision, calling it "immaterial."  Dkt. 26 at 27.  But as the Court observed in *Matson IV*, the D.C. Circuit drew the explicit-versus-implicit distinction in *Matson I*, so "[t]o the extent that Matson finds fault in the . . . distinction . . . [,] it must take that issue up with the D.C. Circuit."  2022 WL 3139004, at *6.

In summary, Matson offers no basis for the Court to reconsider its reasoning in *Matson II* and *Matson IV* that the court of appeals has exclusive jurisdiction under the Hobbs Act to review orders, like the one at issue here, that explicitly rely on § 50501.

Having concluded that the Hobbs Act vests exclusive jurisdiction in the courts of appeals to consider challenges to orders issued pursuant to § 50501, the Court once again concludes that it may not exercise concurrent jurisdiction over those aspects of the 2022 Approval Order that do not turn on an interpretation or application of § 50501.  *Matson II* and *Matson IV* both concluded that the "courts of appeals have exclusive jurisdiction to review the entirety of this type of multiple-authority order," and accordingly held that the Court entirely lacked jurisdiction to review the 2015 and 2021 Approval Orders.  *Matson IV*, 2022 WL 3139004, at *6 (quoting *Matson II*, 466 F. Supp. 3d at 190).  For the same reasons provided in those cases, the Court now holds that it lacks jurisdiction to review any aspect of the 2022 Approval Order.

This jurisdictional holding disposes of Matson's motion for a preliminary injunction: Matson has failed to carry its burden of establishing a substantial likelihood that this Court has jurisdiction.  This is not a case, moreover, in which special considerations might permit the Court to issue a preliminary injunction or brief stay while, for example, the Court permits factual development or further briefing on jurisdiction or evaluates a novel jurisdictional issue.  To the contrary, this is now the third time the Court has considered the issue, and, absent further guidance from the court of appeals, the parties and the Court are reduced to repeating arguments and decisions that are by now well rehearsed.

Nor is the Court persuaded that it should express a view at this point on the merits of Matson's case or motion for a preliminary injunction.  Convinced that it lacks jurisdiction, the Court has no "power to declare the law."  *Steel Co*., 523 U.S. at 94.  Here, moreover, Matson has

sought a stay of MARAD's order before the D.C. Circuit on precisely the same grounds that it seeks a preliminary injunction from this Court.  As a matter of both judicial economy and respect for the separate spheres of the district courts and courts of appeals, the Court will abstain from opining on matters that it need not decide (at least at this time) and that are pending before a superior court.

But because neither MARAD nor APL has moved to dismiss this action, *see Food & Water Watch*, 808 F.3d at 913 ("[A]n inability to establish a substantial likelihood of standing requires denial of the motion for preliminary injunction, not dismissal of the case."), and because the exact same jurisdictional issue posed here is currently pending before the D.C. Circuit, the Court will merely deny the pending motion and will leave for another day whether the case should be dismissed.  If the court of appeals concludes that it lacks jurisdiction over Matson's petition and that jurisdiction is, instead, vested in this Court, Matson can renew its motion for a preliminary injunction at that time.  And, if the court of appeals concludes that it has either exclusive or concurrent jurisdiction over Matson's petition, MARAD and APL may move to dismiss this action, either for lack of jurisdiction or as duplicative.  Until then, however, the Court will hold this case in abeyance.[2]

---

[2] Because the Court does not reach the merits of Matson's motion for a preliminary injunction, the parties' dispute regarding whether the Court should strike the supplemental declaration of John P. Lauer is moot.  MARAD's motion to strike that declaration, Dkt. 27, is therefore **DENIED** as moot.

## CONCLUSION

For the foregoing reasons, the Court will **DENY** Plaintiff's motion for a preliminary

injunction.  Dkt. 7.

**SO ORDERED.**

<u>/s/ Randolph D. Moss</u>
RANDOLPH D. MOSS
United States District Judge

Date: August 19, 2022